## 4062.   MANGHAM v. THE STATE.

1. To constitute the offense of embezzlement there must be both a wrongful conversion and a fraudulent intent; but where money of the principal is knowingly used by the agent for his own private benefit, and in violation of his duty to the principal, it is none the less embezzlement because at the time of the unlawful use the agent intended subsequently to restore the money.   An officer or agent of a corporation can not take money of the corporation, entrusted to him or in his possession by virtue of his official relation or agency, and use it temporarily for his private benefit and avoid criminal responsibility by calling it a loan.   The law calls such a transaction a wrongful conversion, from which a fraudulent intent can be inferred.   Applying the foregoing principle of law to the proved facts of this case and the in-

ferences fairly and reasonably deducible therefrom, the verdict of guilty was authorized.

2. Where the evidence shows that the treasurer of a corporation took possession of notes executed by it, by virtue of his official position, and subsequently discounted them and deposited the proceeds to his personal account in banks outside the county in which the corporation was located and had its principal office and place of business, and failed thereafter to account for the funds or to pay them into the treasury of the corporation in that county, the venue of the offense of embezzlement, growing out of this wrongful conversion of the funds, was properly laid in the county where the corporation had its principal office and place of business, and where the treasurer obtained possession of the notes and presumptively formed the criminal intent.

3. An indictment charged the embezzlement of an aggregate sum of money, the aggregate embezzlement being made up of a series of specific criminal conversions extending through a continuous series of years, some without and some within the statute of limitations as to criminal prosecutions. As to the former the indictment contained an allegation of a statutory exception to the application of the statute. *Held:* (*a*) The question as to the bar of the statute of limitations is fully ·controlled by the decision of this court in *Cohen* v. *State,* 2 *Ga. App.* 689 (59 S. E. 4). (*b*) Evidence of all the acts of embezzlement, whether without or within the bar of the statute of limitations, was admissible for the purpose of showing fraudulent intent.

4. The charge of the court, considered as a whole, was a full, fair, clear, and accurate presentation of the law as to all the material issues. It was most favorable to the contentions of the accused, and if any error was committed, it was not against, but in favor of the accused.

5. The numerous assignments of error are without merit, and no reason appears that would warrant the grant of another trial.

DECIDED AUGUST 9, 1912.

Indictment for embezzlement; from Spalding superior court— Judge Daniel. February 15, 1912.

*R. R. Arnold, Frank Flynt, C. G. Mills, W. A. Fuller, Dodd & Dodd,* for plaintiff in error.

*J. W. Wise, solicitor-general, W. H. Beck, T. E. Patterson,* contra.

HILL, C. J. 1. Mangham was convicted of the offense of embezzlement, as defined by § 186 of the Penal Code of 1910. His motion for a new trial being overruled, the case is here for review. The record is exceedingly voluminous. It contains a demurrer to the indictment, based on numerous grounds; and the motion for a new trial, besides the general grounds, contains thirty-five special grounds. The grounds of the demurrer are substantially repeated in the motion for a new trial, and the grounds which we deem of sufficient importance to require special elaboration will be treated

of without reference to where they are made, whether in the demurrer or in the motion for a new trial. For the purpose of illustrating the questions raised by the record which we deem material to be decided, we will make a general preliminary statement of the facts.

The Boyd-Mangham Manufacturing Company was a corporation, created under the laws of Georgia, for the purpose of manufacturing and selling cotton goods, having its principal place of business and location in Spalding county. Its capital stock was $150,000. J. J. Mangham was officially the treasurer of the company, and, in addition to his duties as treasurer, during all the time in which the corporation was carried on, the entire management of its affairs was entrusted to him by the stockholders and the board of directors. The mills manufactured annually 2,500 bales of cotton, the output amounting to about $200,000 a year. Mangham bought all the cotton, whether "spot" or for future delivery, and sold all the manufactured goods, principally through A. D. Smith & Company of New York City, collected for the sale of these goods, borrowed money whenever he deemed it necessary on the notes of the corporation, furnished to the bookkeepers and clerks under him the data to be entered on the books, and furnished annually to the stockholders and the board of directors a financial statement, made up under his personal and direct supervision. The board of directors gave very little attention to the management of the affairs of the corporation, but seemed to be contented with an annual declaration of dividends, based upon the statement furnished to it by Mangham, the treasurer. During this period Mangham's management of the mills was apparently successful and profitable to the stockholders, they having received in dividends nearly $200,000. In 1911 the corporation was declared insolvent, and bankruptcy proceedings were instituted against it. An examination of its books by expert accountants developed many and serious irregularities and numerous false entries, evidently designed to conceal its true financial condition. It would be profitless and a useless consumption of space to note all of these false entries and irregularities, and it is impossible to say whether they were made for the purpose of concealing the true condition of the company from the directors and stockholders and creditors, or for the purpose of enabling the defendant, as treasurer and as the ex-

clusive manager of the affairs of the company, to carry on, undiscovered, an improper individual use of the funds of the corporation. The writer of this opinion, after a careful consideration of the evidence, believes the first hypothesis to be correct. The jury, however, were authorized to accept as the truth the latter hypothesis.

It is interesting to note some of the more prominent false entries shown by the books, according to the testimony of the experts. In 1911 the difference in round numbers in the condition of the Boyd-Mangham Manufacturing Company as shown by its books, and its true condition as shown by the audit, was $200,000. The books showed $200,000 more assets than the company really had, and that the company had $150,000 of unimpaired capital and $80,000 of surplus. The audit showed that it actually had no surplus, and that its capital stock was greatly impaired, if not entirely eliminated. The amount carried on the books as cash, by statement made April 30, 1910, was $27,954.11, while the actual cash was only $7,388.40. On September 18 and 19, 1908, the book entries showed cash amounting to $33,457.72, while the actual cash was only $1,717.44. On February 4, 1911, the actual cash on hand was $43.15, and the book entries representing cash showed $44,757.95. The expert accountant who made the examination and audit of the books in 1911 testified that although these book entries contained a cash item of $40,000, there was in fact no cash on hand. He also testified that while the ledger and the financial statement made by the treasurer on May 8, 1910, showed a surplus of $97,295.69, there was in fact at that time a deficit of $111,-372.34, or over $200,000 difference between the amount shown by the ledger and the statement and the amount discovered by the examination.

The difference between the apparent situation shown by the entries on the books and the real situation shown by expert examination is comprehensively summed up in a full statement made by one of the experts. (1) The real estate and the machinery were carried on the books at a much greater valuation than they were really worth. (2) The mill supplies represented to be on hand were a great deal more than were actually on hand. (3) The statements showing money, assets, and interest were incorrect. (4) The value of coal on hand was stated to be $5,451, when in

fact there was no coal on hand. (5) The books showed as assets $100,771.80, accounts receivable, the vast majority of which were valueless. And the conclusion is that when these items which were valueless, and which were carried as valuable assets, were eliminated, the value of the stock and the overplus were all wiped out. Entries on the books showed that Smith & Company of New York, who, as before stated, sold the products of the mill, owed the company $40,000; in other words, the books showed that they had sold goods for the mill for which they had not paid; but the examination made by the expert in connection with the examination of the books of Smith & Company showed, as a matter of fact, that Smith & Company did not owe the mill anything, but, on the contrary, the mill owed Smith & Company about $40,000, a difference of $80,000. This one entry alone on the books made it appear that the mill possessed a valuable asset of $40,000 more than it really did possess. There are many other discrepancies between the apparent condition of the mill as shown by the books and the real condition of the mill as proved by the expert examination and audit; and while, as before stated, these discrepancies and irregularities may be consistent with the personal honesty of Mangham, they can not be reconciled with official integrity, and were sufficient to permit the jury to deduce the theory that they were made for fraudulent purposes; and unquestionably this theory of the many false entries and discrepancies largely influenced the verdict.

Coming down to the specific charges of embezzlement against Mangham. The indictment alleges that as treasurer, at divers times, continuously during the years of 1905, 1906, 1907, 1908, 1909, and 1910, he embezzled of the funds of the company the sum of $23,412.50; and it further alleges, that during these years he made fraudulent entries on the books of the corporation for the purpose of concealing from the corporation the embezzlement of this amount of money; that he converted this amount of money to his private use by illegal speculation, and by otherwise disposing of it, not for the benefit of the corporation. The evidence in support of these allegations as to the false entries has already been partially discussed. As to the allegation that he fraudulently appropriated the sum specified to his own personal use, several specific instances are shown, a few of which we will note. The president of the Fulton National Bank, located in the city of

Atlanta, testified that his bank discounted notes in the year 1910, made by the Boyd-Mangham Manufacturing Company, for $11,500; that the company did not have an account at his bank, and that the proceeds arising from the discounting of these notes were placed by Mangham to his individual account at the bank, and that subsequently, from time to time, all the proceeds so deposited were checked out by him. · The president of this bank stated, that there was nothing in the transaction that indicated to his mind any irregularity or impropriety; that he knew that Mangham was the financial man of the mill, and that Mangham said, at the time, that he had authority to discount the papers; and the witness supposed that Mangham used it legitimately, or he would not have discounted the notes; that he extended the credit to Mangham, Mangham having indorsed the notes; that these notes were not paid by the mill or Mangham, and were still an outstanding obligation against both. The note teller of the Atlanta National Bank testified, that on January 11 his bank discounted a note of the mill for $2,000, which was presented to the bank by Mangham, and that the proceeds were deposited by Mangham in the bank to his individual credit; that the note in question was indorsed by J. J. & J. W. Mangham; and that $1,000 of this note was never paid. The discount clerk of the Central Bank & Trust Corporation of Atlanta testified, that during the years 1906, 1907, 1908, 1909, and 1910, his bank discounted notes of the Boyd-Mangham Manufacturing Company, ranging from $5,000 to $15,000, which were presented to the bank for discount by J. J. Mangham; that some of the proceeds of these notes were placed in the bank to the individual credit of Mangham. All of these notes, however, were paid a year before the insolvency of the manufacturing company.

There are other specific instances given in the evidence, which, it is claimed by the State, tend to prove the allegation of embezzlement, made in the indictment. Without going specifically into this evidence of alleged technical embezzlement at least, it may be stated generally that Mangham apparently treated the funds of the corporation as his own. To use the language of the bookkeeper: "He continually put in money and drew it out." In this connection he says again: "The situation was that J. J. Mangham would put in a certain amount of money, and possibly the same

day he would get the money from the mill. He loaned the mill money, then executed a note to himself for it and discounted it, and debited himself with the proceeds of it. While the mill was borrowing money from Mr. Mangham, he was borrowing money during the same period from the mill. The amount of his notes from July, 1907, to the present time [1911] aggregated $13,949.80, and all his notes were paid by being charged to his personal account." The bookkeeper testified further that at the time of the failure the books showed that the mills owed Mangham $10,000. The expert accountant testified that in fact at this time Mangham owed the mills $8,582.99. It was for the jury to settle this conflict in the evidence.

The accused did not deny this method of dealing with the trust funds nor the discounting of the notes of the corporation, and the deposit of the proceeds thereof to his credit. He claimed that he was entitled to do so because the corporation owed him more than the amount of these notes at the time the discounts were made, and that he was fully authorized, by his position in the corporation and by his uniform transaction of its business in this manner, to reimburse himself for the use of his individual funds by the corporation. As to these matters it may be remarked here that the learned trial judge charged the jury in substance as follows: that if the evidence showed that the accused was an executive officer of the corporation, having in charge the business and the investing of the funds of the corporation, and generally financed the business of the company, the deposit of the funds of the corporation to his own individual account in the bank would not constitute the offense of embezzlement, but the presumption would be that he was using the money of the corporation for the business of the corporation, and the State would have to go further and show that he did not use the money for the corporation, but that in taking such money he intended not to apply it to the business of the corporation. This statement as to the law is a statement most favorable to the accused, but we can not concur in the view of the trial judge that it is a correct statement of the law with reference to the crime of embezzlement. On the contrary, we think that an official of a corporation, whatever may be his duty in reference to the funds of the corporation, whether or not the entire matter of financing the affairs of the corporation was entrusted to him, would in no event

28

be legally authorized to .discount the paper of the corporation and deposit the proceeds thereof to his individual credit; and if he did so, it would amount to a wrongful conversion of the funds of the corporation, and would cast upon him the burden of proving that the money thus deposited to his individual credit was used for the benefit of the corporation and not for himself. The law relating to official duties and official trusts is plain and inflexible on this subject. It does not fix a period of time during which an official entrusted with the funds of a corporation could make individual use of these funds before it would amount to a wrongful conversion, but fixes the existence of the wrongful conversion as contemporaneous with the individual deposit of the funds to his own credit, and puts upon him the burden of showing that notwithstanding an apparent wrongful conversion, there was in reality no such conversion by him, by compelling him to show that although he deposited the funds to his individual credit, it was then done for the benefit of the corporation of which he was the trusted official. It is true an official to whom the corporation is indebted at the time of this apparent conversion might relieve himself of the charge of embezzlement by showing that as a matter of fact the funds so deposited were used for the benefit of the corporation in payment of its debt due him, yet the burden would certainly be upon the accused official to make it very clear that at that time the corporation did in fact owe him the amount of the proceeds of the deposit arising from the notes made by the company which he had discounted; and unless he did so, the jury would be authorized to infer that the use of the funds by him was for his individual benefit, and not for that of the corporation.

Right here it may be stated, in justice to the accused, that the evidence is very clear that he frequently indorsed notes for the purpose of raising money for the corporation, indeed that he went to the limit of his own personal credit for this purpose, and that there was rarely a time during his connection with the corporation (which amounted to the life of the corporation) that the corporation did not owe him and he did not owe the corporation; and when the corporation's failure came, the evidence was in conflict as to which was the creditor or debtor, the corporation or the accused official. The jury were authorized to accept the statement of the expert accountant that at the time of this failure the accused

was indebted to the corporation, and to discredit the statement of the accused made to them, as well as the testimony of the book-keeper, that at that time the corporation was indebted to him. But we will not extend this discussion of the evidence any further. It is sufficient to say that there were transactions, extending through a period of five or six years, from which the jury were authorized to infer that the accused had used the funds of the corporation, certainly in an unwarranted manner. Coupled with this fact were the untrue entries made during this period of time on the books of the company, apparently for the purpose of concealing the true condition of the corporation; and the jury were authorized to infer that these entries, which were made from data furnished by the accused, were made for the purpose of concealing his individual indebtedness to the corporation and his wrongful dealing with its funds, rather than for the purpose of concealing the condition of the corporation in order that it might be continued as a going concern.

We confess that we are very greatly impressed with the clear, detailed statement which the accused made in his own defense. This statement was a very lucid explanation of the specific acts of alleged fraudulent conversion apparently proved against him; and we may state also that the record discloses that the management of this corporation by the accused had been for many years very successful, and that its eventual failure was not primarily due to his management or to his dishonesty, but to other causes, such as business conditions of the country which were beyond his control; and it is well-nigh incredible that a career of honesty and efficiency should have ended in the crime of embezzlement. It is difficult to find a motive for the commission of such a crime by a trusted official who had for years carried on the business of his trust, not only honestly, but most successfully, and whose financial success depended upon the continued successful existence of the corporation in his charge. The failure of this corporation meant his personal, individual failure; it meant his financial ruin; it meant the end of his business career; it meant individual bankruptcy for him and his brother, for the evidence discloses that they were indorsers on the paper of the corporation at the time of its failure, for a very large amount. All these questions, however, were for the decision of the jury, and this court can not say that the con-

clusion at which they arrived, while it may not be entirely satisfactory to the members of the court as individuals, was not supported by the evidence.

This court lays down the rule of law to be, under the statute defining embezzlement, that there can be no legal individual use, however temporary, of trust funds. The trusted official may not intend, at the time of such wrongful temporary use, a permanent misapplication of the funds entrusted to him; but if he uses for a short time, for his individual benefit, the funds of the corporation entrusted to him as an official and coming into his hands as an official, it is none the less the crime of embezzlement, even though he may have at the time intended subsequently to make restitution. The fraudulent intent will be inferred from a temporary individual use of the trust funds, and the act, prima facie at least, will be branded as embezzlement. *Orr* v. *State,* 6 *Ga. App.* 628 (65 S. E. 582) ; *Jackson* v. *State,* 76 *Ga.* 551. An officer or agent of a corporation can not take money of the corporation which is entrusted to him, or which comes into his possession by virtue of his office or agency, and use it even temporarily for his personal benefit, and avoid criminal responsibility by calling it a loan. The law calls such a transaction a wrongful conversion, from which a fraudulent intent can be inferred. It may be that Mangham as treasurer could lawfully loan his own money to the mills and subsequently repay these loans by taking the money of the mills and by discounting its notes, but the practice is not to be approved. It is of doubtful propriety and dangerous, and certainly placed upon him the burden of showing that the balance was at all times in his favor.

We conclude this discussion of the general grounds of the motion for a new trial by the statement that while, in our opinion, the evidence did not demand the verdict of guilty, yet there were circumstances from which the jury, in the exercise of their exclusive prerogative to weigh motive and conduct and to draw inferences from facts, were authorized to find a verdict of guilty.

2. We will now take up and consider, in so far as deemed material, the special assignments of error made in the amended motion for a new trial. It is insisted that the venue was not shown by the evidence; that as to the specific acts of the accused in discounting the notes of the corporation in the city of Atlanta and in

depositing the proceeds of such notes thus discounted to his individual credit in the banks of Atlanta, the fraudulent conversion took place in Fulton county, and not in the county of Spalding. Even as to the acts which took place in the county of Fulton, we think the venue was properly laid in the county of Spalding. The corporation of which the accused was an official was located in Spalding county. There was its principal office and place of business. The books of the company were all located in Spalding county. In contemplation of law the funds of the company were received by its treasurer in Spalding county. The notes of the company which he discounted in Fulton county were presumptively made in Spalding county by the corporation. These notes came into his possession by virtue of his official connection with the corporation in Spalding county. It was his duty as an official to account to the corporation for these funds which thus came into his hands in Spalding county. The company may have had many deposits elsewhere than in Spalding county, but, in contemplation of law, all of these deposits were in the possession of the accused as treasurer of this corporation in Spalding county. If he went out of Spalding county and, by reason of his position as treasurer of the corporation, got actual possession of these funds in some other county, this would make no difference. The embezzlement,— that is, the taking and carrying away with intent to steal,—would be where his duty as an official called upon him to make an official accounting and to pay into the treasury of the company the money which came into his possession as such official. It would be absurd to hold that if a president of a bank located in the city of Atlanta, in the county of Fulton, should go to New York City, where his bank keeps an account, and draw from that bank the funds of the bank of which he is the official head, and in New York City deposit the funds thus drawn to his individual credit, the embezzlement of the money of the bank would take place in the city of New York. To so hold would put it in the power of an official of a bank or other corporation either to avoid altogether criminal responsibility for his offense, or to make very difficult the prosecution and proof of such offense. In other words, wherever the money of the corporation may be deposited subject to the check of its treasurer, whether in this State or in another State, if the treasurer checks the money out of the bank where deposited, and uses it for his

own benefit, with a fraudulent intent to deprive the corporation of it, his prosecution for the offense of embezzlement can be properly and legally had in the county where the corporation is located and transacts its business, and where the official, in the discharge of his duties, should account to the corporation for its funds which have come into his possession by reason of such official position, and where presumptively the fraudulent intent was formed. Irrespective of this, however, there were specific acts which the jury in this case were authorized to believe constituted wrongful conversions of the funds of the corporation, which were consummated within the county of Spalding.

3. It is further insisted, that some of the acts alleged by the State to have been criminal occurred four years prior to the filing of the indictment, and were therefore barred by the statute of limitations, and that the testimony relating to these alleged criminal acts should have been excluded. The allegation in the indictment is that an aggregate sum was embezzled, but that this aggregate sum was made up of repeated and continuous acts in a series of embezzlements extending through a period of six years prior to the filing of the indictment. Conceding that some of the alleged criminal acts were barred by the statute of limitations, evidence relating to them was nevertheless admissible for the purpose of showing fraudulent intent as to those which were not barred. *Jackson* v. *State,* 76 *Ga.* 551. Our decision on this point covers many of the exceptions taken as to rulings on testimony and excerpts from the charge of the court. Again, in addition to what has been said on this subject, the indictment alleged that the offense as described therein was "unknown until on or about the first day of January, 1911," and this allegation was sufficient to make an issue, and evidence relating to this issue was submitted to the jury, and there was sufficient evidence to show that the offense was not known until 1911, when an audit of the books of the mills was made. Besides, this was a special presentment by the grand jury, and the allegation that the offense charged therein was unknown was sufficient to cast upon the defendant the burden of showing that it was not true. *Cohen* v. *State,* 2 *Ga. App.* 689 (59 S. E. 4). The evidence also shows that the accused had entire control and management of the mill during its entire existence; that he frequently loaned money to the mill and borrowed money

from it during the period of his management. Many of these loans were subsequently repaid by the accused, and it might be well said that the crime of embezzlement was not complete until it was definitely determined as to the amount of the funds of the mill which he had wrongfully converted to his own use by a failure to replace the funds in the treasury of the company. But irrespective of this, the question raised as to the statute of limitations is not a material question in the case, in view of the fact that some of the acts of alleged criminality were proved to have been committed, if at all, within the statutory period.

4. The following excerpt from the charge is assigned as error: "I charge you that the intention to fraudulently appropriate may be inferred from the facts and circumstances, that is, by direct or circumstantial evidence. It may be inferred from falsified accounts, from making false statements and attempting to conceal the true state of the financial condition of a corporation. And when these things are shown, it is sufficient to require the defendant to explain such facts and circumstances; and if not satisfactorily explained, a conviction will be authorized, if the fraudulent taking has been proved." This extract from the charge is objected to on the ground that it was an expression of an opinion upon the facts, and was equivalent to telling the jury that an intent to steal in this case could be inferred from falsified accounts, or from making false statements, or from attempting to conceal the true state or financial condition of the corporation, and this was entirely a question for the jury. The excerpt is not justly subject to this criticism. There was much evidence relating to irregularities in keeping the books. Many false entries were proved. Whether this juggling with the books was for the purpose of concealing the existence of embezzlement or improper use of the funds of the corporation by the accused, or was for the purpose of keeping the corporation a going concern and preventing its bankruptcy and failure, was one of the material issues to be decided by the jury. The jury could reasonably infer that an official who had had almost the exclusive control and management of the corporation during its existence, and who had proved that he was very efficient in the management of its affairs, should be able to give a clear account of every dollar of the corporation which had been expended in its behalf by him, or which had come into his hands as

its treasurer and general manager, and they could also well infer that the books which were kept under his direct supervision were improperly kept for the purpose of covering up improper appropriations and use of the company's money. The judge did not tell the jury as a matter of law that these facts would show a fraudulent intent, but he simply told them that they might consider these facts in arriving at a conclusion as to the existence of a fraudulent intent, and that the fraudulent intent might be inferred from such false entries or irregularities. This unquestionably was a correct statement of the law applicable to the evidence. *Jackson* v. *State,* supra, and citations.

5. Some exceptions are made to other excerpts from the charge. We have examined them carefully in connection with the entire charge and the evidence, and find that these exceptions are without merit. In fact we do not hesitate to say that the instructions of the trial judge contain a full, fair, and accurate statement of all the issues made by the evidence. The truth of this statement is shown by the fact that many of the exceptions contained in the amended motion are based upon the allegation that the verdict was contrary to the charge on the various issues involved. The learned judge gave the accused the benefit of a favorable charge on every contention insisted upon by him. In many instances the criticism might be justly made that the instructions were much more favorable to the accused than he was entitled to expect or to receive under the law. The record clearly demonstrates that the accused has had a fair trial; that no error of law was committed against him, but that on the contrary, if any errors were committed, they were in his favor.

An exhaustive and careful examination of the record fails to disclose any reason why another trial should be granted.

*Judgment affirmed. Russell, J., absent because of illness.*