Wilkin, J.
May 20, 1912, the accused took $37,000 of funds, which came into his possession as superintendent of banks of Ohio, from state banks, where they were deposited by virtue of Section 742-6, General Code, and used them in the city of New York to pay his private indebtedness. He repaid the amount of the funds into the banks June 8, 1912. Later he was indicted under Section 12876, General Code, for embezzling and converting these trust funds to his own use on the date first named. At the trial, upon a statement of the facts to the jury by the prosecuting attorney, the accused moved the court to direct a verdict of acquittal. The court sustained the motion, and discharged the accused, for the reason- that “he had accounted in time by the repayment of other money of equal value.’ '
The pertinent clause of the statute reads thus: “Whoever, being elected or appointed to an office of public trust or profit, embezzles or converts to his own use * * * anything of value that shall come into his possession by virtue of such office or employment, is guilty of embezzlement,” etc.
He based his. right to acquittal on the proposition that the conversion must be with the intention of depriving the owner of the money, and the crime is complete only after a failure to account and pay it over.
He argues: (1) That the temporary appropriation of the money to his own use, with the intention of restoring it, is not a conversion within the meaning of the statute; and (2) that he does not become an embezzler till he becomes a defaulter.
The logic of both propositions is somewhat con *271 fused. The first is that a trustee who appropriates a trust fund, without the owner’s knowledge, to pay his own debt, and afterwards repays the secret loan, does not embezzle the fund. This loses sight of one important test which is not conceded in the statement of the case, viz.-, that at the time he diverted the fund he intended to restore it. The fact that the accused deposited other money of equal amount in the proper place after the misappropriation is only circumstantial evidence bearing on the question of his intention when he purloined the fund. To say the least, such evidence of good motive, without anything else, is hardly convincing; it is not conclusive. The return of the money may have been impelled by the dread of exposure and the fear of punishment, rather than an original intention to restore it, which was in his mind at the time he withdrew it. Of course repentance and restitution do not expunge the guilt.
The second proposition also comes short of the mark. It leaves the decisive question unanswered, whether or not the secret purpose or use for which the custodian of public funds abstracts them, without authority, may determine his guilt or innocence. We think the true test is, Is there a wilful misappropriation of the trust fund, or a breach of faith by the employe to whose custody the fund is entrusted for the benefit or use of the employer or owner? In this case the trustee secretly used the money of the state, for his own benefit and profit, on the hazard of being able to replace it when or before the state would require it. He speculated on the risk of becoming a defaulter; *272 he therefore contemplated the chance that he might not be able to repay. Whether he did this for his own emolument or his mere convenience, he was speculating with public funds, which is certainly a public evil intended to be forbidden and repressed by the statute.
It will be noticed that the predicate words of the statute are “to embezzle or to convert to his own use.” The meaning of these words is to be found in the body of the general law; they are legal terms which are to be understood according to their legal signification. A precise laconic definition of either of them, which will comprehend their full import and cover all cases, can not be found, if indeed one can be made. Conversion has been defined as follows: “An appropriation of the thing to the party’s own use and beneficial enjoyment, or exercising dominion over it, in exclusion or defiance of the owner’s right.” (2 Greenl. Ev., Sec. 642.) “Assuming upon one’s self the property and right of disposing of another’s goods.” (Lord Holt, 6 Mod., 212.) “An act of dominion over personal property, inconsistent with the right of the owner.” (Bigelow on Torts, 1875, 428.) “Any distinct act of dominion wrongfully exerted over one’s property in denial of his right, or inconsistent with it.” (2 Cooley on Torts, 3 ed., 859.) And see b Bouv. Die. (1897), 433; 38 Cyc., 2005.
A definition of embezzlement is still more difficult to find or to frame. It is a form of the evolution of the law of larceny, and therefore a modification of that crime. The act may be said to consist of a fraudulent misappropriation of an *273 other’s goods by one to whom their custody has been entrusted. It is purely a statutory offense, and the distinctive features of the crime must be gleaned from the various statutes which define it for each jurisdiction.
The law of the particular phase of the subject which we have in hand, so far as it has been determined and formulated by juristic science is tersely stated by a writer whose treatise has become a classic and an authority. We quote from the late Joel Prentiss Bishop’s New Criminal Law, Yol. 2:
“The gist of common-law larceny is the felonious ‘taking’ of what is another’s, with the simultaneous intent in the taker of misappropriating it. But in the statutory embezzlement there is no felonious taking, for the thing comes to the servant by delivery either from 'the master or a third person. * * * So that the question now is, by what act, after it is received, does the servant commit the embezzlement? * * *
“Our inquiry concerns the act, not the evidence.. The rule of law appears only indistinctly in the books. Still we may infer from the authorities, and from the reasons inherent in the question, that if the servant intentionally does with the property under his control what one must intend to do with property taken to commit larceny of it, he embezzles it, while nothing else is sufficient. Or, assuming the needful criminal intent to exist, he must and need only do what in our civil jurisprudence is termed conversion, defined to be any dealing with the thing which impliedly or by its terms excludes the owner’s dominion. To illustrate,— *274 if the servant, instead of delivering the property to his master or another, as required by his duty,, pledges it for his own debt, or runs away with it, or neglects or refuses to account for it, or otherwise wrongfully diverts its course toward its. destination to make it his own, he embezzles it. Yet much of even this is, when accurately viewed, rather evidence than the offense itself. For, to' constitute the offense it is not necessary there should be a demand for the money alleged to be embezzled, or a denial of its receipt, or any false account, * * * or refusal to account.” Sections 372, 373.
He treats of the intent as an ingredient of the crime, under the title “Larceny.” The following excerpts will serve our purpose: “In strictness of language there are in larceny two intents; namely, to commit the asportation by trespass, and to make the felonious misappropriation of the thing stolen. Yet commonly and practically we mean by this term the latter. It is in this sense that the word is in the present sub-title employed. * * * It means the purpose to deprive the owner of his ownership in the thing taken; and whether or not for some advantage to the trespasser, or as otherwise expressed for lucre, is one of the purposes of this sub-title to consider. * * * ‘What is meant by felonious intent/ said Reade, J., ‘is a question for the court; and after the court defines that, then it is for the jury to say whether the defendant had such intent/ But the law on this question of intent is difficult, and the authorities are in a measure conflicting. Yet relating to it there are some leading doctrines reasonably certain.” Section 840.
*275 “Some have held that if one takes another’s goods to pledge them, intending to redeem and return them afterwards, he does not commit larceny. Plainly a defendant to avail himself of this limitation of the intent must show it; for outwardly and prima facie these facts indicate theft. And Gurney, J., once said to a jury: T confess I think that if this doctrine of an intention to redeem property is to prevail, courts of justice will be of very little use. A more glorious doctrine for thieves it would be difficult to discover, but a more injurious doctrine for honest men cannot well be imagined.’ Now, a man who pledges an article transmits an ownership which, though not perfect, will become so if he fails to perform to the pledgee the condition; this is very different from his merely holding it in his own temporary-custody and using it. Probably, therefore, this taking is in principle larceny. So, at least, such a transaction would now generally appear to be regarded. And, both in principle and authority, the intent in larceny need not be to deprive the owner of the whole thing taken; it is enough that the purpose is to get from him the entire ownership of any part thereof. Thus, it is larceny to carry away any article of property to conceal it until the owner will offer a reward for its return, and for the purpose of obtaining the reward.” Section 841.
“We find it not infrequently said in the books that the taking must be lucri causa * * *. Blackstone mixes, thus: ‘The taking and carrying away must be felonious; that is, done animo *276 furandi; or, as the civil law expresses it, lucri causa * * * . But this is by no means the only criterion of criminality; for in cases that may amount to larceny the variety of circumstances is so great, and the complications thereof so mingled, that it is impossible to recount all those which may evidence a felonious intent, or animum furandi; wherefore they must be left to the due and attentive consideration of the court and jury.’ (4 Bl. Com., 232.) Now, these words of the Commentator * * * really convey about as exact an idea as can be stated.” Section 842.
“Some hold that the thief must intend to convert the thing to his own use. But the true view, where the rule of lucri causa is conceded, is simply that he should mean some advantage to himself, in distinction from mischief to another.” Section 843. “We have intimations that if one taking an article tenders its value in money prima facie he is not guilty of larceny. Not necessarily will the offer of pay exempt him, but East says it is 'pregnant evidence’ that the purpose was not felonious. (2 East P. C, 662, 3 Greenl. Ev., Sec. 157.) On various theories of a defense the court might in some circumstances be asked to submit such a fact to the jury.” Section 845.
This lucid epitome of the law, so far as it has been developed by the decided cases, gives us a clew to the solution of the problem presented by the record in this case. Our author shows us, first, that the return of the property misappropriated by the trustee is only an ex post facto circumstance, which should go to the júry for what it. may be worth as reflecting the motive of the trustee at the time of the appropriation; second, if the *277 criminal intent accompanied that act, the crime was complete, and demand and refusal to account and pay over were not necessary. Therefore, if the court of common pleas sustained the motion and directed a verdict of acquittal on the theory that the prosecutor failed in either or both of these particulars to state an offense, its ruling was wrong. It should at least have submitted the case to the jury with proper instructions as to the evidentiary value and legal import of these two features.
The third proposition suggested by the author’s summary is, that the temporary diversion of the fund to the trustee’s use without the owner’s consent is embezzlement. Therefore his repayment of the money would not purge his breach of trust of its felonious character, though he intended at the time of its misuse to deprive the owner of it only temporarily. Rarely does a defaulter intend to'become a defaulter when he begins his peculations. How often has the sequel shown that the faithless custodian felt absolutely srire that he would be able to replace the fund before it would be called for ? Who knows how many a defaulter relied with absolute certainty upon his ability to show that, when he shifted the funds from his custody or his trust account to a temporary use or his personal account, there was absolutely no danger of the funds being lost? Therefore how easily it may be. shown that the ninety and nine who go astray had no intention of depriving the owner of his money. Nevertheless the theory advanced by the accused in this case, and adopted by the judge who acquitted him, is that mere, *278 chance determines the criminality or innocence of the act; whether he is a felon or a guiltless man depends merely upon his ability to replace the money when he is called to account. By this theory his case is ruled by blind fate, not by blind justice. In other words, it is not the blameworthiness of the act or of the mind, but the result of the hazard, or the skill of the actor, in playing the game, which decides its legal quality. Such a doctrine offers temptation to a thousand-thousand custodians of trust funds, whose temptations are great enough at best; it encourages the reckless and unfortunate to commit crime, whereas the very purpose of the statute is to deter the tempted fiduciary from a breach of his trust and to protect society from the evils of a practice which has become wellnigh epidemic. If the law be given such a loose interpretation and be so feebly enforced, public faith and credit will be impaired and the stability of the financial institutions of the state will be in jeopardy.
In the case of the Board of Education v. Thompson, 33 Ohio St., 321, the board permitted the treasurer to use the fund in his business, pending litigation between the board and a special school district as to the custody of a fund in the township treasury, on his agreeing to pay interest. The object was to earn sufficient by such use to meet the interest which the board would be charged if the litigation should be decided against it. When the treasurer’s term expired the loan was renewed and note with sureties was taken for the amount with interest. This court held that the transaction amounted to embezzlement under the statute *279 as it then existed (2. S. & C, 1610). The court said: “The purpose of this and other statutes, as was said of similar acts then in force, in State v. Buttles, 3 Ohio St., 321, is to operate on the agents, officers, and others having charge of public moneys, and deter by fines and penalties, the commission of such acts. The power is denied them to make such contracts.”
In the Buttles case, Ranney, J., made the following comments: “It is unnecessary for us to examine them [the statutes] in detail. We have carefully read them all, and are entirely satisfied, that the policy of the state has always been, what we have no hestitation in saying it should have been, to prohibit its officers and agents from loaning or dealing in its funds either on public or private account. * * *
“The first section subjects to the penalties prescribed by law for feloniously stealing property, any officer appointed or elected under the constitution or laws of the state, or any agent or servant of the state, who should convert to' his own use, or use by way of investment in property or merchandise, or make away with or secrete, any money or valuable security received for safe keeping, disbursement, transfer, or other purpose, which might be in his possession, or over which he might have supervision, care, or control by virtue of his office or agency. * * * It seems to us, that the language and purpose of the section are both disregarded, when it is taken for anything less than an absolute prohibition to every officer, agent, or servant of the state, having public moneys in his hands, or under his control, to loan *280 them out, either on private or public account, without express authority of law. * * * We have no difficulty in saying that the whole object, spirit and design, is preserved when they [the statutes] are made operative between the state and its agents, in deterring the latter from the interdicted use of the public moneys. * * * Unwilling to trust the agents of the state, the legislature has seen fit to deny them the power to loan the public funds, and the better to secure obedience has. prescribed penalties for the transgression of its instructions.”
Again: It was said a county treasurer who should deposit the public moneys in a bank, with or without interest, though directed so to do by the county commissioners, would violate Section 6841, Revised Statutes (now Section 12873, General Code), and be guilty of embezzlement; and if the county commissioners' should advise and direct such deposit to be made they would be equally guilty. Williams, J., State, ex rel., v. Ellet, 47 Ohio St., 90, 100. See also Davis v. Gelhaus, 44 Ohio St., 69.
In a later case, speaking of Section 6846, Revised Statutes (now Section 12878, General Code), the court said the object of this statute is to punish as an offense the diversion, appropriation or application of the funds of a municipal corporation or a board of education to a use other than that for which the funds were raised; and a conversion of the money to his own use by an officer or agent of such corporation is a violation of Section 6841, Revised Statutes (now Section 12873, General Code), and makes him guilty of embezzle *281 ment of public moneys. State v. Johnson, 53 Ohio St., 307.
The court below said that what constitutes wrongful conversion depends entirely upon the duties required by the trust; if the. obligation is such that the trustee is required to account within a definite time, and he uses the money but later secures other money and pays to his principal according to his duty, he is not guilty of a breach of duty nor of a crime, although he may have committed a moral wrong; we cannot apply to such a situation the rule of law prevailing in larceny, where there is a wrongful taking by trespass and the crime is complete, though the money is after-wards returned.
The exception here intended to be made is of those trusts whose terms, express or implied, permit the trustee to commingle’ the funds of the trust with his own. The idea is that in such cases there is no default and therefore no breach of the trust till the trustee .fails to account and pay over. Cases have been .cited in argument where trust and private funds were permissively or innocently commingled, and the trust fund, by inadvertence, consumed by overdrawing in ignorance of the fact that the private fund was exhausted. This case has no semblance to that class. And the italicized clause, supra, betrays a subconscious recognition of the fact that this case does not fall within the exception, else why does the trustee commit a moral wrong when he uses the trust money, secures other money and pays it to his principal? The reason is that he had no right to use the public’s money and did so wrongfully, and the pay *282 ment of other money after the conversion does not relieve him of culpability.
The court’s distinction between this case and larceny is useless also. Whether it be trespass by wrongful conversion or by wrongful taking, the unlawful use of the money is an invasion of the owner’s right of property — an infraction of law, just the same, which the statute penalizes. But the learned lower court finds the conversion to be a moral wrong only; the taking, a crime complete. Both wrongdoers have appropriated the owner’s money — which the law forbids — and both return it. Why is not the latter absolved as well as the former? The former having lawfully got the money into his custody for safe keeping, puts it out of his custody for his own use. The latter unlawfully takes possession of the money for his own use. There is, however, a difference; it is this: ■ The former violates not merely the owner’s right of property, but also the owner’s trust and confidence; his crime is doubly heinous and damnable. But shall the repentance and return of the plunder by the embezzler acquit him while it does not acquit the thief?
Both of these distinctions are illegitimate. The first implies that the law ignores the moral obliquity of the act, if no money is lost. If the learned common pleas judge had in mind moral turpitude, the implication may be true, but it is irrelevant. If he had in mind conventional morality, the implication is false. True, the law is not for moral discipline; and we need not flounder in the metaphysics of the ethical basis of Law. This law condemns the act and punishes the offender, *283 because the act is hurtful to society, endangers the state, and therefore must be repressed. Whether the offender’s motive be culpable or innocent, it does not excuse him, even though he did not intend. to violate the law.
The second distinction is unsound, because it implies that one may use or invest what belongs to another, for a short time, if he gets the custody lawfully, though explicitly on trust that he will not use it or put it out of his custody, even though he convert it into something else of. the same kind of equal value and surrender the equivalent upon demand.' This proposition juggles with Truth, Time and Fate. It would sanction every species of gambling with public money by every officer in the commonwealth and by every custodian of trust funds in banks and all other institutions, secular and religious.
We do not assume the authority of enforcing the precepts of mere morality, Christian or Aristolean, nor is it our function to declare the laws of social ethics. But it is our duty to interpret the laws of the state in harmony with those maxims of practical morality, private and public, which are recognized by the enlightened common sense and good conscience of the people of the state. Those maxims are the mainsprings of the civil laws, for upon them the moral order, peace and prosperity of society depend; and unless they be implied as imbedded in the laws, civil authority will lack the sanction and support of public opinion and government will become impossible.
To say that an officer of state, who is entrusted with the custody of public funds, may secretly use *284 them to redeem securities pledged by him for his debt in New York, and then excuse his delinquency by showing that his luck has turned and the securities have been turned into money and the deficit has been made up before he is prosecuted, shocks the moral sense of mankind: Yet that is what the court below decided he may do. We cannot thus interpret the law. The law was made no less to deter those who are tempted to speculate with their trust than to punish those who violate it. To effect the former purpose and stop the too prevalent contagion, as well as to maintain public credit and confidence in our laws and institutions, is a most humane and important object to be kept in view by the courts who are called upon to execute this law.
That the unlawful appropriation of the property, though not with the intention of depriving the owner of it entirely or finally, constitutes the crime, is foreshadowed by the case of Berry v. The State, 31 Ohio St., 219, thus: “The wrongful taking and carrying away of the property of another, without his consent, with intent to conceal it until the owner offers a reward for its return, and for the purpose of obtaining the reward, is larceny.” And that demand and refusal to restore are not requisite to make the offense, nor is restitution or the offer thereof a defense, is the doctrine of Railroad Co. v. O’Donnell, 49 Ohio St., 489, thus: In a petition, in an action for conversion, which avers that the defendant converted the plaintiff’s property to his own use, it is not necessary to allege a demand and a refusal to deliver; such a demand and refusal may afford sat *285 isfactory evidence of a conversion, but are not the only evidence. It is no defense to this action for the value of the goods, that they were tendered, after conversion; and the motive by which a party was controlled in the conversion of property is of no avail as a defense, though it may be shown when exemplary damages are claimed.
True, the latter is a civil action, but the delict is, by the very language of the statute (Section 12876), the same in this case as in that; the only difference is that in the cited case the private law is invoked to redress an injury to an individual, whereas in the case at bar the public law is invoked to denounce and punish a wrong to society and the state.
The question then remains: Had the accused, by the terms or the nature of the trust, the privilege of using the trust fund? If he had not, clearly neither his intention to replace it nor his replacing it, nor both together, will save him from the stigma of the crime, though by the innocent error of the learned lower court he has escaped punishment, because the Bill of Rights saves him from the jeopardy of another trial.
Now, neither the statement of facts made to the jury by the prosecutor nor the statute (Sections 742-6 to -12, General Code) which defines the terms and purpose of the trust, shows that the accused had a right to use the money which came into his custody as superintendent of banks of the state. The suggestion is preposterous.
And the suggestion that the return of the money reflects back to the time of its conversion and raises an inference that the accused did not in *286 tend an unlawful appropriation of it, is, under the circumstances of this case, no less preposterous. A man holding the responsible trust and high station of state superintendent of banks must be presumed to know the first simple, cardinal duty of his office as liquidator of financial institutions of the state. To permit the suggestion that Baxter did not know it was a breach of trust to purloin the funds in his custody and exchange them for securities in New York, on the hazard of being able to hypothecate the securities for money to replace the funds, would be to make a mockery of justice. The court below said it was a moral wrong. That is enough. If it was wrong it was a breach of trust, hence an unlawful conversion. Baxter knew, and the law will not permit him to say he did not know, that it was felony He stands guilty on this record though the cannot be branded with his crime.
We hold that the fact that the accused returned the money, even if he intended to return it when he secretly appropriated it to his own use, did not bar the prosecution nor exonerate him from punishment. There are decided cases which support this judgment. We cite some of them: Robinson v. Commonwealth, 104 Va., 888; U. S. v. Gilbert, 4 O. F. D., 251; Mangham v. State, 11 Ga. App., 427; State v. Summers, 141 N. Car., 841; State v. Shuman, 101 Me., 158; Dean v. State, 147 Ind., 215; Fleener v. State, 58 Ark., 98; Commonwealth v. Tenney, 97 Mass., 50; Commonwealth v. Butterick, 100 Mass., 1; State v. Leicham, 41 Wis., 565; People v. Butts, 128 Mich., 209; Commonwealth v. Mason, 105 Mass., 163.
*287 The learned judge below advert's to a nisi prius case, to which exceptions were denied by this court, also to some remarks (more or less obiter) made by members of this court in passing oh cases under similar statutes, which seem to declare that there can be a conversion only where there has been a default by failure or refusal to pay over. He says this court “should be responsible for allowing that impression to go out which may deceive any lower court.” However that may be, we do not find that this court has decided the law, for a case such as this, to be different from the decision we now make.
He further states that he followed “the rule of strict construction which applies to criminal statutes” — a humane rule justly designed to protect innocence, but too often resorted to as a subterfuge by criminal defenders to befog the judicial conscience. He reached this conclusion: “If there is not a remedy for what may be regarded as a moral wrong in such a case as this, it is for the legislature to create one and not for the court.” The doubt thus engendered by that overworked rule was, by the court’s taking what seemed the safer and humane side and following misleading expressions of some judges of this and other courts, resolved in favor of the accused and the jury was ordered to acquit him. This was error.

Exceptions sustained.

Nichols, C. J., Johnson, Donahue, Newman and Wanamaker, JJ., concur.