STATE, Respondent v. DILWORTH et al., Appellants

(159 N.W.2d 795)

(File Nos. 10387, 10389.  Opinion filed June 24, 1968)
Rehearing denied July 30, 1968

**Frank L. Farrar,** Atty. Gen., **Tony Weisensee, Horace R. Jackson,** Spec. Asst. Atty Gen., Pierre, for plaintiff and respondent.

**John E. Burke** and **Gene E. Pruitt,** Sioux Falls, for defendants and appellants.

BIEGELMEIER, Judge.

Defendants Dilworth and Flake were conjointly indicted and convicted for fraudulently appropriating and converting to a use not in the due and lawful execution of their trust $7,000 of the Commonwealth Investment Corporation of which they were officers, directors, agents and stockholders contrary to SDC 13.4003 of the Code of 1939, commonly known as embezzlement. The State claimed defendants, while actively in charge of Commonwealth as President and Vice President and General Manager, committed the embezzlement by diverting such funds to Small Business Investment Corporation hereafter sometimes called SBIC, a corporation they organized in Colorado with an office at 1650 Wilshire Blvd., Los Angeles, California; that SBIC was organized and operated to further the ends of their plan and merely a method of procuring such funds for their own uses. The evidence, involving Commonwealth, SBIC and several other corporations and their financial and business transactions, is much involved and will be detailed later.

I.

Defendant Dilworth assigns as error the admission in evidence of a transcript of a hearing held in the matter of SBIC on June 23, 1965 at Los Angeles, California before the Division of Labor Law Enforcement of that state, claiming "Dilworth's admission of ownership in the entity Small Business Investment Corporation, a California corporation (SBIC)" was "unconstitutionally elicited in violation of the constitutional privilege against

self-incrimination." Dilworth's objection states it was an investigatory proceeding with criminal penalties, that he was not under (the present) indictment at that time and use of it would in effect be "compelling him to testify against himself without proper constitutional safeguards * * * recently * * * enumerated by the Supreme Court." We assume the objection goes to Art. VI, § 9, of the S. D. Constitution granting the privilege against self-incrimination. This privilege is not confined to criminal matters but extends to all manner of proceedings in which the testimony is to be taken and protects both witnesses and parties. Merely being compelled to appear in obedience to a subpoena and be sworn is no violation of the constitutional privilege and if the witness testifies he will be deemed to have done so voluntarily. These were doctrines laid down in State v. Sinnott, 72 S.D. 100, 30 N.W.2d 455 cert. den., 334 U.S. 844, 68 S.Ct. 1512, 92 L.Ed. 1768, where, over objections on similar constitutional grounds, the court held testimony theretofore given under subpoena in a trial of a civil action was admissible in the later criminal action as it is the right of a party in a civil action to call a witness and interrogate him. Indeed, this is a statement of the fundamental maxim recognized for more than three centuries that the public has a right to every man's evidence and any exemptions which may exist are distinctly exceptional, being in derogation of the positive general rule. 8 Wigmore, Evidence § 2192 (rev. 1961). This is not to say the general statement may impair any constitutional privilege, such as that to remain silent and refuse to testify. This privilege of silence is for the benefit of the witness and is deemed waived unless invoked. A witness entitled to claim that privilege cannot testify and then contend he is deprived of a constitutional right. Wigmore further states, however, "Where the witness waives (the privilege) by answering, his answers may be **afterwards used against him,** because the privilege, in disappearing, disappears completely." 8 Wigmore, Evidence § 2276(5).

■ Dilworth makes an assertion the California hearing involved an alleged criminal act. Nothing in the record leads to that conclusion, nor does defendant point to any facts or cite any law to support it. The purpose was not stated though it

indicates some employees of the corporation had made claims for wages due and the validity of these was discussed at the hearing. From our examination of pertinent sections of the California Labor Code and opinions cited by the State we conclude this was an administrative proceeding of the wage claims made against the employer corporation (not Dilworth) under Section 92 of the California Labor Code and unrelated to any criminal acts. See Ex Parte Trombley, 31 Cal.2d 801, 193 P.2d 734, and People v. Hampton, 236 Cal.App.2d 795, 46 Cal.Rptr. 338.

Two other matters deserve mention. As in State v. Sinnott, supra, there is "no indication that the civil action (here administrative hearing) in which appellant testified was brought to secure evidence of his guilt of a crime." Statements he was President, owned 40% of the stock and other voluntary testimony of SBIC's and other corporations' affairs at this hearing with no hint of any criminal act were far removed from and prior to the time the embezzlement prosecution was commenced. It further appears after one off-the-record break, Dilworth testified he was with the Bank of America 26 years, and after another the Commissioner advised him he had not informed him as to his rights here, to which Dilworth stated, "Oh, I understand". Then followed:

"Q You have a right to counsel and you have a right not to make any statement that may tend to incriminate you. Now, these statements have been made and what is your position now?

"A The truth is the truth, Mr. Pierce. I have nothing at all to hide and I know that I have an obligation to pay these things. I intend to do so as soon as it is humanly possible. Mr. Callahan, I am sure, felt that I was telling him the truth when I told him this".

One cannot read that record and come to any conclusion but that Dilworth not only testified willingly, but that he was an adept and intelligent witness who gave the impression he wanted to cooperate with the Commissioner, yet resulted in giving very little definite evidence on the subject under inquiry and ended

by taking back with him the very records he had been directed to produce. Exhibit 15 was properly admitted in evidence as State v. Sinnott indicates.[1] The State called 17 witnesses, many under subpoena and court order, who testified as to their employment and official capacity in many banks and corporations. Adopting defendants' position would bar use of their admissions at some future trial.

Defendants cite State ex rel. Henning v. Jameson, 71 S.D. 144, 22 N.W.2d 731, where the court discussed the right of defendant in a criminal action "to defend * * * by counsel" guaranteed by Art. VI, § 7, S. D. Constitution and "Assistance of Counsel for his defence" by the Sixth Amendment to the U. S. Constitution, also Spevak v. United States, 158 F.2d 594, cert. den. 330 U.S. 821, 67 S.Ct. 771, 91 L.Ed. 1272, and United States v. Lavelle, 3 Cir., 306 F.2d 216, of similar import. They are inapposite for defendant Dilworth had counsel in this criminal action and they do not apply to nor hold counsel is required to appear for a witness at a labor hearing. Their quotation from State v. Hinz, 78 S.D. 442, 103 N.W.2d 656, concerned in-custody confessions or admissions under the due process clauses of Art. VI, § 2, S. D. Constitution and the Fourteenth Amendment to the U. S. Constitution. That question is not presented.

## II.

■ ■ Defendant Flake, appearing by separate counsel, objected to Exhibit 15 for the reason it involved proceedings in California wherein Dilworth was questioned when he was not then a defendant in this criminal action, had not been indicted, was not properly advised that any statement he made might be used against him which would invade his (Dilworth's) constitu-

---

1. Where the criminal indictment was based on the same claimed unlawful acts as the civil action, Chief Judge Lumbard for the court in United States v. Simon, 2 Cir., 1967, 373 F.2d 649, wrote: "It could hardly be contended, and appellees do not contend, that the prosecution in the Southern District could be enjoined from using the deposition testimony given by the appellee (defendant) Simon before the Southern District indictment was returned." Cf. United States v. American Radiator & Standard San Corp., 3 Cir., 1967, 388 F.2d 201. Under Point IV, Dilworth argues Exhibit 15 was not admissible because the question of who owned or controlled SBIC on December 9, 1964, was not "in any way" involved in the California hearing nor were the issues the same, thus indicating no connection with that hearing and this action and the voluntary nature of the statements there made. See also Simmons v. United States. March 18, 1968, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, opinion by Mr. Justice Harlan, Note 23.

tional rights. The only objection that merits discussion is the attempt of Flake to claim Dilworth's constitutional privilege. This claim of privilege can be made solely by the person whose privilege it is and is purely personal to himself. 8 Wigmore, Evidence § 2196. Flake therefore had no right to claim it on his behalf. He also contends on appeal several other grounds such as his constitutional right to be confronted by witnesses against him, denial of equal protection of the law under Art. IV, § 2, U. S. Constitution, violation of the hearsay rule and of due process of law. None of these grounds is specified as to the offer in the trial court and the grounds of the objection being particularly stated, the court has said all others are deemed waived. State v. Leehman, 2 S.D. 171, 49 N.W. 3. We have held the evidence properly admitted as to his co-defendant Dilworth and if Flake desired some limitation of its admission as to him, he should have so requested.

### III.

The claim of lack of corroboration of Exhibit 15 has no merit, as corroboration was both unnecessary and ample.

### IV.

Both defendants assert error in giving Instruction 15. Among other things it advised the jury that admissions made by a defendant were to be considered if the jury believed beyond a reasonable doubt they were freely and voluntarily made. Dilworth's trial court objection was he had testified in his own behalf and the instruction was therefore immaterial. His testimony did cover most of the facts as to his connection with SBIC and much more of his familiarity with and control of that corporation. If Exhibit 15 was then immaterial it was not error to give the instruction. The further objection that it suggested the jury give particular attention to everything Dilworth said and thus prejudicial has no merit. The instruction did not specifically refer to the Exhibit but to any admissions made.

Flake urges the only purpose of the admission in Exhibit 15 "went to SBIC" and as this matter was fully substantiated by

independent evidence exclusive of this Exhibit (as mentioned in Point III above), there was no necessity for directing the jury's attention to it. The reason given that other evidence including the testimony of each defendant supported the admissions in Exhibit 15 indicates it was not error to give the instruction as to Flake. Again it referred to admissions generally and not only to Exhibit 15.

## V.

Lastly it is claimed the State failed to prove beyond a reasonable doubt that either defendant committed a criminal act in South Dakota or had any ownership of SBIC—a necessary link to convict them. In the brief, Dilworth asserts failure to prove he had any part of the transfer of Commonwealth funds "from Sioux Falls to California" or that Flake had anything to do with the transfer of the funds in California from Linbec, Inc. to SBIC. The motions at the close of all the evidence were generally that the State failed to prove defendants' guilt and did not indicate the lack of proof. They included the reasons set out in similar motions made at the close of the State's case which did set out specific claims of the failure of proof. Much of the Dilworth motion to dismiss the indictment upon which this assignment rests was based on the assumption Exhibit 15 was improperly admitted in evidence and consequent lack of proof of ownership or control of SBIC by him and that the records of Commonwealth and Linbec showed the transactions as loans preventing the jury from finding otherwise.

It is not disputed that during 1964 Flake was first President, later Office Manager and Dilworth was Treasurer, Vice President and then President of Commonwealth. There was evidence the jury could find Dilworth and Flake caused SBIC to be incorporated in Colorado (Dilworth was President, Flake was Executive Vice President) and during 1964 they controlled, operated and used it for their own purposes and as the destination of Commonwealth funds sent to it through other corporations. Whether stock was issued to the persons who organized it is immaterial for the jury could not only find it was their alter ego —it could hardly have done otherwise. One cannot read the

testimony and exhibits without concluding defendants managed and operated SBIC without regard or concern of its corporate or noncorporate structure and Commonwealth without concern or regard for the positions of trust they held as its officers. With part of this money SBIC rented and remodeled a building for offices at 1650 Wilshire Blvd., Los Angeles, California.

Before alluding to the specific errors presented in the assignments of error some further evidence which indicates the mode of defendants' operations will be mentioned. Of necessity it will omit details and background of the many individuals and corporations involved as shown by the 800-page transcript and over 200 exhibits.[2]

The proof to support the embezzlement charged was that on December 9, 1964, defendant Flake directed Commonwealth's office manager to make a transfer of the $7,000 to a corporation in California named Linbec, Inc., to be sent attention of Mr. Gunderson, 1650 Wilshire Blvd., Los Angeles, California. The manager drew a Commonwealth check payable to the First National Bank of Sioux Falls for $7,000 with a notation "Linbec" thereon. With this check he purchased a bank draft for that amount payable to Western Union and then presented it to Western Union which wired the proceeds thereof less its charges to the Los Angeles Western Union Office; the facilities and office of Linbec were in Burbank, California. Dilworth had advised SBIC Comptroller, Savage, that money to cover the payroll of SBIC was coming from South Dakota. Western Union, however, refused to deliver the proceeds of the $7,000 to Savage as he was not an officer of Linbec. The check was delivered to W. D. O'Morrow, President of Linbec, and he endorsed it for Linbec in blank and delivered it to Dilworth. It was immediately endorsed SBIC by William Dilworth and another officer and deposited by Dilworth to a new SBIC account at the Security First National Bank in Los Angeles. A signature card was signed by defendant Dilworth showing he was President of SBIC. There was evidence that SBIC had opened an account

2. Mention is made there is no index of exhibits as required by Supreme Court Rule 71 of 1939, SDC 1960 Supp. 33.0743(6).

with the Bank of America August 4, 1964, where Dilworth also signed a signature card showing he was authorized to sign checks for SBIC and listing him as President. This account lasted four months until December 4, 1964, when it was ordered closed by Bank of America authorities.

Linbec was the conduit of this $7,000; how it, Imperial Industries, Ltd., American Video and other conduits fit in the transfers is of interest. A corporation called Skyco in the business of making skylights became financially insolvent and all its fixtures and property were taken over and sold by the government to pay taxes; Linbec, Inc. was organized to buy this property at the sale, purchased it for $13,000 which money was raised by executing a first mortgage to Hamilton Thrift and Loan Co. which it later foreclosed; during 1964 and from the time of its organization Linbec was also having financial problems and difficulty in meeting its payroll and continuing in business and later ceased operations. Imperial Industries, Ltd. was a Colorado corporation which was originally based in Denver but changed its corporate domicile to California in September 1964.[3] Dilworth received 4,250 shares of its stock for arranging a $25,000 loan for it in early 1964. He testified he terminated his stock ownership July 30, 1964. A McLynn was involved in this stock-loan transaction. He was in some way involved with SBIC in charge of the office, authorized to sign checks, and an old crony and associate of Dilworth. SBIC paid McLynn's apartment rent in excess of $2,000 and there was evidence the jury could find Dilworth had released reserve funds to one of his corporations some years back when Dilworth was in charge of loans in a California branch bank.

California American Video originated in 1962. In 1964 it was bankrupt and its assets sold by the referee to defendant Dilworth on his bid of $79,000. The initial payment of $5,000 came out of Commonwealth funds by the following process: Flake drew a Commonwealth check for $10,000 to the Sioux Falls bank which wired it to Linbec, which immediately con-

---

3. Neither Linbec nor SBIC was authorized to do business in California.

verted $5,000 into a Cashier's Check to the bankruptcy trustee and the other $5,000 went to SBIC. Commonwealth's record showed this as a loan to Linbec. The other $74,000 took the route of a Commonwealth check to the Sioux Falls bank in that amount wired to a Los Angeles bank for credit of Retail Credit Bureau which bought a Cashier's Check payable to the bankruptcy trustee. Commonwealth's ledger sheet showed this as a debt of Retail Credit Bureau which Dilworth admitted was not an obligation or debt of Retail. In January 1965 Dilworth caused American Video Incorporated to be formed in Colorado and on January 15, 1965 he executed a $74,000 note for that corporation payable to Commonwealth and delivered it to its Receiver. After the present indictment Dilworth transferred these assets to the Receiver in February 1966 and contended at the trial he had purchased the assets for Commonwealth. It may be unnecessary to point out the inconsistency of this contention for, if he did the latter, Commonwealth owned Video, was entitled to the Bill of Sale he executed and he did not owe the $74,000 or the note he executed; if he did not buy it for Commonwealth, he (not his nonexistent corporation) owed the debt evidenced by the note he delivered rather than the Bill of Sale.

With this background the evidence—which included other transactions offered and received to show motive, intent and concert of action (State v. Schultz, 52 S.D. 209, 217 N.W. 213)—was substantially the following:

1. August 18, 1964, Commonwealth's Manager, at Flake's direction, drew a Commonwealth check for $6,100.00 and sent it to Linbec; August 20, SBIC received $1,800.00 from Linbec.

2. August 27, 1964, Commonwealth's Manager, at Flake's direction, drew a Commonwealth check for $2,000.00, payable to Linbec; August 28, Linbec endorsed the check and it was then endorsed by SBIC and deposited by SBIC.

3. September 11, 1964, Commonwealth's Manager, at Flake's direction, drew a Commonwealth check for

$10,000.00 payable to Linbec; September 14, SBIC received $5,000.00 from Linbec.

4.  September 22, 1964, Commonwealth's Manager, at Flake's direction, drew a Commonwealth check for $5,000.00 to Imperial, which check was endorsed by Imperial to SBIC and credited on SBIC books September 24.

5.  October 2, 1964, Flake drew a Commonwealth check for $10,000.00 to the First National Bank in Sioux Falls, which transmitted the money to a California bank for Linbec, where it was split, $5,000 to SBIC, $5,000.00 to American Video; on the same day SBIC credited $5,000.00 on its books.

6.  October 15, 1964, Commonwealth's Manager, at Flake's direction, drew a Commonwealth check to the First National Bank for wire transmittal to Imperial in the sum of $15,000.00; October 16, SBIC received and deposited $5,000.00 from Imperial.

7.  October 28, 1964, Commonwealth's Manager, at Flake's direction, drew a Commonwealth check for $10,000.00 to the First National Bank for transmittal to Imperial; the money was received at a Los Angeles bank, endorsed by Imperial and deposited to the credit of SBIC, which showed the receipt on its books for that day.

8.  November 6, 1964, Commonwealth's Manager, at Flake's direction, drew a Commonwealth check for $5,000.00 to Imperial, which was endorsed by Imperial to SBIC, and entered on SBIC books November 9 as a debt due from SBIC to Imperial and thus as a book credit to Imperial's account.

9.  November 18, 1964, Commonwealth's Manager, at Flake's direction, drew a Commonwealth check for $5,025.44 to Linbec; November 29, SBIC credited the Linbec account with $3,000.00.

10. The transmission and receipt of the $7,000.00 on December 9, 1964, the specific subject of the indictment and trial which are related above.

11. December 22, 1964, Flake and Dilworth drew a Commonwealth check to Linbec for $15,000.00; on the same day SBIC received $5,000.00 from Linbec.

a. Commonwealth was borrowing money for use in its operation at 10.6% annual interest.

b. The ostensible loans to Linbec and Imperial were being made at 8% annual interest.

c. Commonwealth had made several ostensible loans to Linbec prior to December 9, 1964, which had come due and payable prior to December 9, 1964, and on which no payments had been received by Commonwealth from Linbec of either principal or interest, nor did the record reveal any other disposition of the overdue accounts.

d. Dilworth instructed Linbec to transfer portions of its receipts from Commonwealth over to SBIC.

e. Flake and Dilworth participated in a meeting in October in Los Angeles concerned with acquired properties for SBIC or one of its proposed subsidiaries.

f. Flake was aware from various communications that Linbec was a poor financial risk.

g. At a time in the fall of 1964 SBIC employees Savage and Wilcox were sent by Dilworth to South Dakota to look at books of some companies in which it was claimed Commonwealth was interested; concerning this, one witness testified: Flake "got us into Thermo-Panel", told them he knew what they were there for, what concerns they were to check, had made arrangements for hotels, had told the people

at the various plants that Savage and Wilcox would be in and to show them the records; and advised them not to tell any of the people at places they checked that they were from SBIC.

The specific assignment of error for Dilworth asserts and he contends it was not shown he committed the criminal act in South Dakota and for Flake that he had anything to do with the act of transferring the funds in California where a crime may have occurred. Defendants misconceive the reach of an embezzlement charge. The principal place of business of Commonwealth, of which defendants were officials, was Minnehaha County where its books and records were located and where, in contemplation of law, funds were received and held by its treasurer. It was the duty of its officers to account to the corporation in that county. If an officer was out of the county and, by reason of his position as an officer, came into possession of the funds or improperly disbursed them in some other county or state, this would make no difference. Mangham v. State, 11 Ga.App. 427, 75 S.E. 512, cited in State v. Teutsch, 80 S.D. 462, 126 N.W.2d 112, on another point. The Mangham opinion in considering a similar situation as to venue of embezzlement said:

"The embezzlement—that is, the taking and carrying away with intent to steal—would be where his duty as an official called upon him to make an official accounting, and to pay into the treasury of the company the money which came into his possession as such official.

"It would be absurd to hold that, if a president of a bank located in the city of Atlanta, in the county of Fulton, should go to New York City, where his bank keeps an account, and draw from that bank the funds of the bank of which he is the official head, and in New York City deposit the funds thus drawn to his individual credit, the embezzlement of the money of the bank would take place in the city of New York."

That is our view.

■ The evidence supports the verdicts and the judgments appealed from are therefore affirmed.

All the Judges concur.