## POTTER *v.* THE STATE.

1. After a witness who has admittedly made contradictory statements touching a matter as to which he is examined essays to offer a satisfactory explanation in regard thereto, it is grave error for the presiding judge, in commenting upon the propriety of not adhering to previous statements which the witness claimed he made under an honest mistake of fact, to so allude to his explanation as to apparently give it judicial indorsement and approval.    That no motion for a mistrial was made because of the remarks of the judge in this connection can not properly be regarded as precluding the party prejudiced thereby from complaining thereof after verdict, in the event the finding of the jury be adverse to him.

2. As in the present case the trial judge not only unwittingly committed an error of the nature above indicated, but gave to the jury an instruction on the subject of impeachment of witnesses which was far from accurate, if not misleading as well, the ends of justice require that the case should undergo another investigation.

Argued April 29, — Decided June 26, 1903.

Indictment for murder. Before Judge Barrow. Chatham superior court. March 14, 1903.

*Twiggs & Oliver, J. E. Myrick,* and *W. W. Sheppard,* for plaintiff in error. *John C. Hart, attorney-general,* and *W. W. Osborne, solicitor-general,* contra.

FISH, J. The plaintiff in error, W. J. Potter, was indicted jointly with his son, Swayne Potter, for the murder of Fred Taylor. The State relied for a conviction both upon circumstantial evidence and upon the testimony of a negro woman, named Candace Kelly, who swore on the trial that she was an eye-witness to the killing of Taylor, and that W. J. Potter was the person who shot him. The jury returned a verdict of acquittal as to Swayne Potter, but found W. J. Potter guilty of the crime of which he was charged. He made a motion for a new trial, which was based upon several assignments of error touching what occurred during the hearing of the case, and also on the ground of newly discovered evidence. His motion was overruled, and he excepted. He therein made complaint of the admission of certain evidence referred to as being "fully set out in the brief of evidence." We can not undertake to pass on the merits of this complaint. *Freeman* v. *Mencken,* 115 *Ga.* 1017. Nor are we called upon to deal specifically with another ground of the motion which fails to set forth the evidence to the introduction of which objection was made, or with an exception to the allowance of proof of a fact which, even if irrelevant, as claimed, could not possibly have influenced the jury to the prejudice of the accused. There are other grounds of the motion, however, which appear to us to have merit, and to these we will devote the remainder of our discussion of the case.

1. A witness introduced by the State testified, on direct examination, that he was at a certain house, near the scene of the tragedy, on the morning of the day it occurred; that he saw the accused in the back yard, and had observed them as they came to the house through a field lying on the left-hand side of a road which

was close by. This testimony was offered for the purpose of show-
ing the whereabouts and movements of the accused after they had
previously left this house, armed with guns, with the expressed in-
tention of going on a deer hunt. It is recited in the motion for a
new trial that "Counsel for the defense sought to show that this
witness did not see the Potters at all, as they returned to the house;
and to that end, on cross-examination, he asked the witness if he
did not state to the grand jury that he saw W. J. Potter returning
to the house *on his wheel.* Witness answered that he did make
this statement, . . because he thought he had a wheel when he came
back." The witness further admitted that on a subsequent occa-
sion, when he was at this house and was questioned by the owner
of it and others concerning the statement he had made before the
grand jury, he then told them he "would have to change" that
statement — "that it was not true that [Potter] had a wheel when
he came back to the house," but that his bicycle had been "left at
the house" when he and his son started on their hunt. . The fact
was also brought out that on another occasion, when the witness
was in the office of the solicitor-general and was asked "about this
man's coming back to the house," the witness replied that Potter
"came on a wheel." When questioned by counsel for the accused
as to what was the real truth of the matter, the witness answered:
"I made a mistake; he did not have a wheel." It appears that
the "witness was then examined on other matters at length, and
when he had concluded his testimony, he was addressed by the
court" concerning his previous contradictory statements, the ques-
tions put to him and the responses made thereto being as follows:
"The court: You said just now that you made one statement, and
then you said you would change that statement? Witness: Yes,
sir. The court: Did you tell them that because you were satisfied
that you had made a mistake? Witness: Yes, sir; I was satisfied
that I had made a mistake." His honor thereupon remarked:
"You did exactly right, then, to change your statement." To the
correctness of this observation the witness gave his assent by say-
ing, "Yes, sir."

It is earnestly contended in behalf of the plaintiff in error that
the above-quoted remark by the presiding judge was "equivalent
to the expression of his opinion that the witness had spoken the
truth. In other words, from the use of this commendatory lan-

guage the jury might well" have received the impression, and probably did in fact "infer, that the court at least believed that the witness was honestly mistaken." There is much force in this argument. While we are satisfied that his honor did not mean to intimate that the witness had acted conscientiously and uprightly in testifying on the trial what he believed was the real truth, and had done exactly right in not adhering to a previous statement which he had made under an honest mistake of fact, yet how can we arbitrarily assume that the jury understood his honor as intending to say merely that if, in point of fact, the witness had made such a mistake and had later become convinced that this was so, then he did exactly right to change his statement so as to make it conform to what he believed was the truth? If it be once conceded that the jury may not have so understood his honor, or that his remark was calculated to convey to them the impression that he was satisfied of the good faith of the witness and approved the course he had pursued, then the making of this remark must be regarded as not only unfortunate, but as affording cause for ordering a new trial. Our Civil Code, § 4334, expressly declares that a trial judge shall not in any case, civil or criminal, "during its progress or in his charge to the jury, . . express or intimate his opinion as to what has or has not been proved;" and this section also contains the imperative mandate that when it shall appear, in any case, that there has been a violation of its provisions in this regard, "such violation shall be held by the Supreme Court to be error, and the decision in such case reversed, and a new trial granted." So it has been held that a disregard of this section on the part of a trial judge "renders the grant of a new trial imperative, without reference to the correctness of the verdict." *Sanders* v. *Nicolson,* 101 *Ga.* 739. In an early case, that of *Pound* v. *State,* 43 *Ga.* 90, this court ruled that the judge of the trial court committed grave error in complimenting a witness for the prosecution, since to do so was "to give an improper potency to the influence of his testimony;" and in *Florida R. Co.* v. *Lucas,* 110 *Ga.* 121, it was held to be a violation of the provisions of the above-cited section of the code to "allude to the testimony of a particular witness in such a manner as to apparently give it judicial indorsement and approval." After mature deliberation, we have reached the conclusion that the remark of the judge of which complaint is made in the present case was calcu-

lated to convey to the jury the idea that he accepted as true the explanation offered by the witness under examination concerning contradictory statements previously made by him, and gave approval to his apparently conscientious retraction of such statements when, as he testified, he became convinced he was mistaken as to what really occurred. See *Alexander* v. *State*, 114 *Ga.* 266.

On the argument before us, counsel for the State suggested that as the accused did not present a motion for a mistrial because of the supposed prejudicial effect of the judge's comment to this witness, but remained silent during the further progress of the trial and took his chances of an acquittal, he could not after verdict with good grace insist that he was entitled to a new trial on that ground. In this connection, our attention was directed to a line of decisions by this court, to the effect that where a solicitor-general is guilty of improper conduct calculated to operate to the prejudice of the accused, the latter is called upon to elect whether he will exercise his right to demand that the trial be stopped then and there, or consent to its proceeding upon the judge's taking all necessary steps to remove any hurtful influence upon the jury by cautioning them not to pay any regard to such improper conduct on the part of counsel for the State, etc., etc. We recognize these decisions to be sound, but are of the opinion that they are not controlling in the present case. A solicitor-general takes the role of an advocate, and experience has demonstrated that he may, at times, in the heat of discussion say things which are improper, or be led by his zeal as a partisan into adopting measures to which resort should never be made. When this occurs, the law gives to the accused the option of either moving for a mistrial, and thereby securing a trial before another jury, or taking his chances of acquittal as thus more or less impaired. When, however, the presiding judge violates the duty of passive noncommittal imposed upon him by the Civil Code, § 4334, the accused is not, and should not be, put to such an election. There is connected with the court no one of higher authority to bestow upon the judge the frown of disapproval or to caution the jury not to allow his improper conduct to influence them. He might, it is true, if called on to do so, undertake to remove its sting by explaining to the jury that he did not intend to express any opinion of his own as to what had been proved, and was not to be understood as even intimating what his opinion in regard thereto

really was.   But he could go no further.   He would not be at lib-
erty to add that, in point of fact, he did not entertain the views his
ill-chosen language would seem to indicate; for to thus attempt to
correct and cure his error as against the accused would involve the
judge into the predicament of committing a fresh error, as against
the State, of precisely the same nature.   So all he could properly
do would be to disclaim any *intention* of expressing or intimating
an opinion, leaving the jury free to draw their own conclusions as
to whether or not he had, as matter of fact, actually committed
himself by unwittingly betraying his views to them.   The law gives
to one accused of crime the absolute guarantee of a new trial in the
event he is deprived of a fair and impartial trial by reason of the
fact that the judge before whom he is convicted commits the grave
error which the above-mentioned section of our code declares can
in no case be overlooked or forgiven.   It is not within our prov-
ince to change the law.

2. Error is assigned upon the following charge to the jury:   "Wit-
nesses may be impeached by proof of contradictory statements, by
disproving the facts testified to by them, and by proof of general
bad character.   Here, too, we come to ground which is the exclusive
province of the jury.   There is no part of the machinery of a court
which can dictate to you, or control you, in estimating the weight
to be given to the testimony of witnesses.   There is no department
of the court which can lawfully judge as to whether a witness is
successfully impeached, if impeached at all, except you.   You have
a right, if you see proper to do so, to believe the testimony of a
witness who is impeached.   You have a right, if you see proper to
do so, to disbelieve the testimony of a witness who is not impeached.
You are supreme in that department.   The weight to be given to
the testimony of witnesses is exclusively for you.   It is the privilege
of parties to impeach, by proof of contradictory statements, by
proof of bad character, and by disproving the facts testified to by
the witness.   Those avenues of impeachment are open to the par-
ties in the case, but after all it is for you to say where the truth
lies."   This charge is excepted to on the general ground that it
does not correctly state the law on the subject of impeachment,
and on the special ground that the jury were thereby instructed,
without qualification or explanation, that they "had the right to be-
lieve, if they saw proper to do so, the testimony of a witness who had

been impeached." We have no hesitation in saying we think we know what the judge meant by this instruction; but we are by no means clear as to whether an average juror would likely be profited, misled, or not enlightened at all thereby. At best, the charge was far from accurate, if not actually misleading and confusing. We hold that the trial judge committed error in giving it. Whether or not it was so prejudicial as to require a reversal of the judgment below, we do not feel called upon to definitely decide. The case must undergo another investigation because of the error pointed out and discussed in the preceding division of this opinion. Were this otherwise, it is exceedingly doubtful whether we would be warranted in upholding the conviction. Unless the jury understood this charge to mean, not that they were at liberty to arbitrarily accept as true the testimony of a witness who had been actually "impeached," but merely that it was for them to determine whether or not an attempt to impeach a particular witness had been successfully made, the charge must have cut very strongly against the plaintiff in error. One of the witnesses he sought to impeach was Candace Kelly, who claimed not only that she was in a situation where she could see the killing, but that she distinctly recognized W. J. Potter, the accused, as the slayer. She further swore she had so testified when she was examined before the grand jury, though she admitted having told an altogether different story when on another occasion she had been questioned by one of the attorneys for the defense. Several members of the grand jury before which she appeared were called upon to testify as to what she had then stated under oath, and, without exception, they swore she had made no pretense of having seen the crime committed or having any knowledge as to who was the perpetrator of it, but stated merely that she heard several shots fired, and left the members of the grand jury under the impression that she had not been an eye-witness to the homicide and could furnish no clew as to who was the guilty party.

*Judgment reversed. All the Justices concur.*