## JENKINS v. THE STATE.

1. The theory of voluntary manslaughter was presented by one view of the evidence, and the trial judge properly instructed the jury as to the law bearing on that grade of homicide.
2. The argument of the solicitor-general to which objection was made was authorized by the facts proved and such legitimate inferences as might be drawn therefrom.
3. Prejudicial error was committed by the presiding judge, who, on being asked to allow the accused to supplement his statement to the jury, said: "Let him finish his statement; I never knew one of them to get through making his statement." This remark was calculated to impress the jury with the idea that the judge entertained the opinion that what the accused might say in his defense was of little importance. (CANDLER, J., dissents.)
4. The charge of the court as to the law relating to self-defense was sufficiently full and explicit, in the absence of an appropriate request in writing to charge more fully as to what might constitute reasonable fears; and the request presented, not being adjusted to the facts of the case, was rightly withheld from the jury.

Argued May 15, — Decided June 17, 1905.  Opinion filed July 31, 1905.

Conviction of manslaughter.  Before Judge Lewis.  Jasper superior court.  March 29, 1905.

Cited, as to matter ruled on in third headnote, *Ga. R.* 12/215; 108/786; 111/832; 114/24, 267; 86/112; 120/797; 101/739; 43/90; 89/161; 117/553, 693; 105/150.

*A. Y. Clement* and *A. S. Thurman*, for plaintiff in error.
*J. E. Pottle, solicitor-general,* contra.

EVANS, J.  The plaintiff in error, Clem Jenkins jr., was charged with the murder of Jim Wilson, and was convicted of

voluntary manslaughter. The court declined to grant the accused a new trial, and he excepts to the judgment overruling his motion therefor.

1. Counsel for the accused insists that the evidence did not warrant a finding of voluntary manslaughter, and that the court erred in charging the jury as to the law bearing on that grade of homicide. While there was testimony which would doubtless have warranted a conviction of murder, and the statement of the accused presented the theory of self-defense, there was also testimony from which the jury might well have concluded that the following summary of what occurred really represented the truth of the matter under investigation : On the night of the homicide, while a younger brother of the accused was on his way to church, he was met by the deceased, who gave him a beating. The accused was told by his brother at the church that he had been mistreated and beaten by the deceased. After the services, a number of persons, including the deceased and the accused, left the church and started home along a public road. The accused asked the deceased why he had whipped this younger brother, saying he was a minor, and, if he had done anything to the deceased, the deceased should have told the boy's mother or elder brother. The deceased made some reply to the effect that he was not going to tell anybody anything, and that he had done what he wanted to, and intended to do as he pleased. The accused said he did not want to have any fuss, and it was not worth while for the deceased to "start his big talk." The latter persisted in his offensive braggadocio, and several of those in the crowd endeavored to persuade him to let the accused alone and to go on peaceably to his home. The deceased declined to drop the matter and continued in his effort to provoke the accused into a quarrel. The accused said : "If you have got that baby gun in your pocket, I will make you use it," and the deceased replied, "I will use it, too." He threatened a number of times to kill the accused, and avowed his purpose to do so when they reached a field on the way home. The deceased stopped a few moments at a house upon the roadside, but caught up with the crowd again at a house some distance beyond, where some of those in the party stopped to get water. The accused, who was accompanied by his wife, did not stop at the well,

but proceeded through the yard along a path which led to his home and to that of the deceased. As the deceased came up to the gate, one of the men in the party called on him to wait, intending to take him home by the road, in order to prevent any difficulty, but he went on into the yard. One of the women then took hold of him and told him to leave the accused alone and go on home to his mother. He jerked loose, saying, "Little Buddy thinks I am scared of him; I will kill him." The accused turned and asked: "What is that you say?" The deceased replied, "You think I am scared of you, but I will kill you!" at the same time advancing with one of his hands in his right-hand pants pocket, as though he intended to then and there carry out his threat. They were but fourteen or fifteen steps from each other. The accused immediately drew his pistol and fired, without waiting for the deceased to make any further hostile demonstration. Only one shot was fired; it inflicted upon the deceased the wound which caused his death. He was not, in point of fact, armed with a pistol, as an examination of his person disclosed when his pockets were searched by some of those present after he fell and was lying upon the ground. In the pocket in which he had his hand only a pocket-book was found, and he had no weapon concealed about him, though it was more or less generally known that he was in the habit of carrying a pistol. He was scarcely sixteen years old, but was large for his age and as tall as a man, and appeared to be larger than the accused. The deceased was of a violent and quarrelsome nature; the accused, however, had never before had any personal difficulty with any one, was of a peaceable disposition, and did not display anger on the way home up to the time the party stopped at the scene of the homicide.

If the deceased did not have a pistol or any other weapon, the life of the accused was not in actual peril at the time of the shooting, nor was the deceased close enough to commit any violent assault upon his person. It was for the jury to determine whether the circumstances were such as to excite the fears of a reasonable man, if they believed the statement of the accused and the testimony of one of his witnesses that the deceased was advancing with something "shiny" in the hand which he was attempting to withdraw from his pocket. If the jury did not believe this to be true, then they would have to deal with the ques-

tion whether, the accused having shot under no real or apparent necessity, he acted under a sudden heat of passion, being provoked beyond endurance by the persistent endeavor of the deceased to draw him into a personal difficulty, and believing the deceased to be armed and inviting him to enter into a combat with deadly weapons. The accused had reason to believe the deceased had a pistol; the latter led him to think so, and threatened repeatedly to use one, though he apparently was not wrought up into a frame of mind where he was prepared to shoot in cold blood and wanted to provoke a quarrel as a pretext for resorting to the use of a deadly weapon. To reduce the killing to the grade of voluntary manslaughter, it was not necessary that any actual assault should have been made by the deceased upon the accused. *Stokes* v. *State*, 18 *Ga.* 17, 37; *Elliott* v. *State*, 46 *Ga.* 163. Where there is a mutual intention to fight, the approach of the deceased in furtherance of his design to do the accused serious injury may be the equivalent of an actual assault upon the latter, so far as reducing the killing to voluntary manslaughter is concerned. *Ray* v. *State*, 15 *Ga*, 223. Our statute defining voluntary manslaughter declares that not only an actual assault or attempt to commit a serious personal injury upon the slayer, but also " other equivalent circumstances to justify the excitement of passion," may be sufficient to exclude the idea of a deliberate and wanton intention to take the life of the person killed. Penal Code, § 64. So, as was held in *Ragland's* case, 111 *Ga.* 211, " Whether an advance by one man armed with a stick on another in the nighttime, and declining to stop when called on to do so, constitute circumstances equivalent to an assault, so as to authorize a homicide to be reduced to voluntary manslaughter, is a question for the jury." True, in the case now before us, the deceased appears not to have been armed with a pistol or other weapon. But the accused had reason to believe to the contrary, and the situation which confronted him is to be viewed, not necessarily in the light of the facts subsequently developed, but as it appeared to him and would have been looked at by a reasonable man placed in his position. *Murray* v. *State*, 85 *Ga.* 378. His state of mind, produced by the circumstances as they appeared to him, was a proper subject-matter to be inquired into by the jury. If an unjustifiable homicide resulted from the accept-

ance by him of a challenge to enter into a mutual combat with deadly weapons, the killing was no more than voluntary manslaughter. *Tate* v. *State*, 46 *Ga.* 148; *Trice* v. *State*, 89 *Ga.* 742. Mutual intention to fight may not only negative the theory of self-defense, but may likewise exclude the idea of malice, if such intention grows out of hot blood produced by provocation other than that induced by mere words, threats, menaces, or contemptuous gestures. If the provocation be produced by an actual assault, by an attempt to commit a serious personal injury upon the slayer, or by "other equivalent circumstances" calculated to excite sudden passion, the fact that the accused shot with the intention to kill would not render the offense that of murder. *Jackson* v. *State*, 82 *Ga.* 449. "Bad" blood, which induces a cherished intention to deliberately kill, is not to be confused with "hot" blood, excited by a sudden and unexpected emergency with which the slayer is, through no fault of his own, unfortunately confronted. In *McGuffie's* case, 17 *Ga.* 514, one theory of the homicide which the evidence presented was that after the accused had, with malicious intent, pointed his gun at the deceased, but had desisted at the instance of bystanders and would not have again pointed the gun at the deceased or have fired upon him, the accused was provoked by the remark of the deceased that he would throw a brickbat at the accused if he raised his gun again; and this court held that if the accused would not have again presented his gun at the deceased, nor have fired at him but for the throwing of the brickbat, the crime may have been no more than voluntary manslaughter. In the case of *Irby* v. *State*, 32 *Ga.* 496, a youth but fourteen years of age was put on trial for murder. The evidence disclosed that while his father and another man were engaged in a fist fight, and a bystander was in the act of separating them, the accused suddenly appeared on the scene with a pistol and shot down his father's assailant without any apparent necessity; yet this court, having regard to the sudden passion which may have been aroused in the breast of this youth upon seeing another man attempting to inflict injury upon his father, held that the evidence warranted a verdict of voluntary manslaughter. In the present case we think the verdict of the jury was fully justified. Indeed it apparently speaks the real truth regarding the homicide with the commission of which the accused was charged.

2. The theory of the State was, of course, that the accused was a man who entertained a wanton disregard for human life. The solicitor-general sought to impress this idea upon the jury by arguing before them that the evidence disclosed that the accused " carried that old pistol down there to the church that night," and that he " carried it there with a purpose." Counsel for the accused objected to this argument, on the ground that there was no evidence before the jury which warranted it, and, the solicitor-general insisting that there was, asked that the stenographic report of the testimony be read in order that the dispute might be settled. The court declined to permit this to be done; "said that the jury would determine what was in evidence, and directed the solicitor to proceed with his argument." Exception is taken to the manner in which the court thus disposed of the matter. There was evidence which at least warranted the inference that the accused did carry his pistol with him to the church on the night of the homicide. One of the witnesses for the State testified that while he and the accused were outside the church, looking " after people's stock," the accused said the deceased had whipped his little brother, and he intended to whip the deceased after they left the church, and, if he resisted, would use a pistol which he then and there exhibited to the witness. Presumably, the accused took his pistol with him to the church. In his statement to the jury, he undertook to explain that he had previously loaned his pistol to " a fellow " who was to return it on the night before, but who on the night of the homicide told the accused, if he wanted the pistol, to come by his house for it; and the accused stated that he had not carried the pistol to the church that night. If he meant that he had called by for his pistol on the way home from church, there was nothing to substantiate his statement, but it was in conflict with the testimony of the State's witness as to the accused having the pistol at the church before the services were concluded. If he intended to be understood as saying that he did not leave home with the pistol, but got it from the borrower while on the way to church, it was still for the jury to say what was the truth in this regard, as they were not bound to accept his statement as true. Certainly the argument of the State's counsel was not wholly without foundation established by the evidence, and the ruling of the court excepted to affords no

ground for setting aside the verdict of the jury, especially as it negatives the idea that the argument objected to influenced their finding, which was that the accused acted without preparation, deliberation, or any other indicia of malice towards the deceased.

3. Immediately after the accused had concluded his statement to the jury, he informed his counsel that he had inadvertently omitted to refer to a matter which he wished to explain to the jury — the reason he happened to be armed on the night of the homicide. Counsel asked permission of the court for the accused to make an additional statement. The presiding judge replied: " Let him finish his statement; I never knew one of them to get through making his statement." Complaint is made that the language used by the judge in granting the privilege asked not only stripped it of all benefit to the accused, but had the effect of creating the impression upon the jury that, in the opinion of his honor, what the accused might say in his defense was entitled to little weight and he had already consumed, to no purpose, much of the valuable time of the court. The remark of the court certainly may have had that tendency. It was discretionary with the judge whether or not he should allow the accused to supplement his statement (*Owens* v. *State*, 120 *Ga.* 209; *Johnson* v. *State*, Id. 509); but, if the indulgence were granted at all, it should have been accorded in terms which would give to the accused the benefit he sought, and not create any unfavorable impression against him. So much importance is attached to the prejudicial influence upon a jury which an unguarded remark by the presiding judge may have upon them, that it is provided by statute (Civil Code, § 4334) that a new trial shall be granted in every case, whether civil or criminal, whenever he shall, during the progress of the trial and in the presence of the jury, either express or intimate his opinion as to what has or has not been proved. The duty of non-committal which this statute imposes upon a presiding judge has been heretofore clearly pointed out. *Hubbard* v. *State*, 108 *Ga.* 786; *Varner* v. *R. Co.*, Id. 813; *Jaques* v. *State*, 111 *Ga.* 832; *Alexander* v. *State*, 114 *Ga.* 266; *Potter* v. *State*, 117 *Ga.* 693. The right of the accused to make to the jury a statement in his defense is one conferred by express statute (Penal Code, § 1010), and that statute declares the jury " may believe it in preference to the sworn testimony in the case."

34

To disparage his statement, which the jury could believe in pref-
erence to the sworn testimony, is to deprive him of the substan-
tial right of having the jury pass upon it uninfluenced by the
expression or intimation of any opinion by the judge that it is
entitled to little or no · consideration.   So, in *Alexander's* case,
supra, this court held he was entitled to another trial because of
the fact that the trial judge inadvertently, during the course of
his charge to the jury, made use of language which was "cal-
culated to impress the jury that they ought to be cautious in giv-
ing credit to what" the accused said concerning the alleged offense.
In *Smith* v. *State*, 109 *Ga.* 479, the accused rested his sole de-
fense, which he sought to establish by his statement and cor-
roborating evidence, upon the theory of accidental homicide; and
he was accorded another opportunity of presenting that defense
to the jury without the "implied judicial disapproval" which was
cast upon it by the remark made by the presiding judge when
he merely incidentally referred to this defense before concluding
his charge to the jury.   In the present case, the sole defense of
the accused was that of self-defense, and he relied almost alto-
gether upon his statement for the establishment of the same.
The prejudicial remark of the court, though lightly made, may
have had undue weight with the jury.   Even had the judge in-
structed the jury to disregard it, "no man could dare say they
were not thereby influenced, to some extent at least," and the
caution given to the jury not to allow it to affect their verdict
could not be regarded as removing its harmful tendency.   *Alex-
ander* v. *State*, 114 *Ga.* 266.   Another opportunity to present
his defense is the only way in which one accused of crime may
be effectually guarded against the hurtful tendency of such a
remark coming from the lips of the judge himself.   *Potter* v.
*State*, 117 *Ga.* 693.   And this being true, it is not, as was held
in that case, incumbent on the accused to move for a mistrial, as
he is reasonably to be expected to do when remarks to his preju-
dice are made by the State's counsel or others connected with
the trial over whom the judge may exercise direction and control.
"The law gives to one accused of crime the absolute guarantee
of a new trial in the event he is deprived of a fair and impartial
trial by reason of the fact that the judge before whom he is con-
victed commits the grave error which the above-mentioned sec-

tion of our code declares can in no case be overlooked or forgiven. It is not within our province to change the law." Ibid. 698.

4. The charge of the court as to the law relating to self-defense was sufficiently full and explicit, in the absence of an appropriate request in writing to charge more. fully as to what might constitute reasonable fears. The request presented was not adjusted to the facts brought to light by the evidence or the prisoner's statement, in that it was based on the theory that he had reason to apprehend that a felony was about to be committed, not only upon his own person, but "on the person of his wife or brother." We accordingly hold there was no error committed in declining to give in charge this request.

*Judgment reversed. All the Justices concur, except Simmons, C. J., absent, and Candler, J., who dissents.*