32389. SIMMONS *v.* THE STATE.

Decided May 12, 1949. Rehearing denied June 10, 1949.

*Hall & Bloch, Carlisle Cobb,* for plaintiff in error.

*D. M. Pollock, Solicitor-General,* contra.

GARDNER, J. ■ Was the indictment good as a matter of form and law as against the demurrer? During the course of the argument on the demurrer, counsel for the defendant called upon the State to elect under which Code section it would proceed and ask for a conviction. The State elected to proceed and did proceed, under the provisions of the Code, § 26-2803. It is contended in the demurrer that two counts were wrongfully joined in the indictment. It was early decided in *Jackson* v. *State,* 76 *Ga.* 551 (13-d), that where there was a continuous series of conversions of property of the owner entrusted to the defendant, the offense may be charged in a single count of the indictment. Such

series of transactions constitute but a single embezzlement. The court said (page 573), "were it otherwise . . there would have to be, in some cases, almost as many counts as there were dollars in the money embezzled. This has been the practice in charges of embezzlement insofar as we know, since the passage of the act in regard to embezzlement." See also *Mitchell* v. *State*, 6 *Ga. App.* 554 (1) (65 S. E. 326) ; *Mangham* v. *State*, 11 *Ga. App.* 427 (3) (75 S. E. 512). The indictment in the instant case is almost identical with the indictment held to be sufficient in *Cook* v. *State*, 8 *Ga. App.* 522 (70 S. E. 31). So the contentions in the demurrer that the indictment improperly joined two counts in one is without merit. It is further contended that the indictment did not allege the crime of embezzlement for that it did not show whether or not the property alleged in the indictment was converted before or after it came into the possession of the owner, the Athletic Association. We think this is without merit. A proper construction of the indictment is to the effect that the defendant by virtue of his employment came into possession and control of the property alleged in the indictment and converted the same to his own use before the property came into the possession of the Athletic Association. We recognize the principle of law that in embezzlement, as distinguished from larceny, the defendant must convert the same to his own use or steal the same before it rests ultimately, actually or constructively, in the possession of the owner. If the taking of the same is after the property is in the possession of the owner, then it is but larceny. We find no difficulty in agreeing with distinguished counsel for the defendant on this principle of law. We think in this connection that this principle clearly appears from the allegations of the indictment. We are not here dealing with and will not enter into a discussion of the many sections of our Code dealing with larceny after trust. In embezzlement an accused is entrusted with the property by virtue of his employment in receiving it for the owner in the course of the duties of the officer or servant or employee of the corporation. This same element of entrustment applies in cases of larceny after trust. But it is not always true in cases of larceny after trust that the conversion takes place before the possession and custody of the money is transferred to the possession of the owner. This element of conversion before the

owner obtains possession of it is always an essential element in embezzlement. In both embezzlement and larceny after trust the possession of the property by the accused is lawfully obtained. In simple larceny the possession of the property by the accused is always unlawfully obtained. Thus it is, in our opinion, that the indictment in the instant case sufficiently sets forth a crime under the Code, § 26-2803. In the arguments of counsel for both parties these principles of law are admitted. The only question being whether the indictment in the instant case is sufficiently clear to charge the offense of embezzlement under the provisions of the Code section by virtue of which the indictment is drawn. Indeed, counsel for the defendant in the course of the brief, in our opinion, virtually, if not in so many words, admitted that the indictment is good under the section under which it is drawn, for counsel said: "The language of the indictment in the case at bar follows the language of the indictment in the *Cook* case [supra]. But the trouble here is that the evidence did not support the charge in the indictment as to the custody and control of the funds nor did the court charge the jury that to constitute the crime of embezzlement the property must have been in the legal custody or control of the plaintiff in error [the defendant here] at the time of the conversion." This statement was made by counsel for the defendant in discussing special grounds 1, 2, 3, and 4 of the amended motion. Counsel for the defendant further states that in *Denmark* v. *State*, 44 *Ga. App.* 157 (161 S. E. 286), "the indictment of a corporate officer showed that the money alleged to have been embezzled had been entrusted to him by the corporation. We repeat that the indictment here in the case at bar does too, but so far as the jury were concerned which passed on the fate of this young man, that that element made any legal difference whatsoever." Therefore, following the argument of counsel for the defendant the discussion moves on to whether (1) the evidence supports the allegations of the indictment, and if it does, (2) whether there was any error committed in the charge of the court or otherwise as alleged in the special grounds. We will then approach a discussion of the evidence as to the general grounds and the assignments of error in the special grounds. As a preliminary to that discussion, since the Code section under which the indictment is drawn designates

"officer, servant, or other person employed in any department, station, or office in any corporate body in this State, or any president, director, or stockholder of any corporate body in this State" a servant or other employee is placed upon the same plane or responsibility as any of the others mentioned. The court did not err in overruling the demurrers to the indictment for any of the reasons assigned.

■ We approach a discussion as to whether the evidence is sufficient to sustain the conviction under the general grounds. The brief of evidence contains upwards of 130 pages. It would be impractical, and we think of no benefit, to attempt here to summarize the evidence introduced. Under the record we conclude that it is not disputed that the defendant is guilty of conversion of at least a portion of the property described in the indictment. We might state that his statement on the trial of the case and his statements before the trial, are sufficient to establish incriminating admissions. These incriminating admissions, in connection with his restitution of a portion of the property, abundantly established his guilt of conversion of at least a portion of the property in question, even though we might concede, for the sake of discussion, that the admissions, statements and conduct of the defendant, do not constitute elements sufficient to make a plenary confession of embezzlement. It might be said, without fear of successful contradiction, that the burden of the argument of his counsel and the thread of his defense throughout the trial, is based on the one proposition that although the evidence is sufficient to convict him of a lesser offense, the evidence is insufficient to convict him of the crime of embezzlement. To this end it is contended on behalf of the defendant that the evidence fails to show that as a servant and employee of the corporation the property alleged in the indictment came into his possession by virtue of his employment; that there was no entrustment which amounted to an element of embezzlement as alleged in the indictment and that the funds converted, and at the time of the conversion, were in the possession of the corporation, and not at the time of the conversion of the property in the possession of the defendant; and that the entrustment which is a necessary element of embezzlement is not supported by the evidence. We will therefore devote our discussion insofar as the

evidence under the general grounds goes, to that one single question, and that is this: Does the evidence show that the defendant, in the course of the duties as a servant and employee of the corporation, came into the possession of the property converted by reason of his employment and by virtue thereof, during the course of his duties; and did he convert the same while thus in possession and custody of the property, before the property finally reposed in the possession of the corporation, actually or constructively?

The evidence reveals that J. D. Bolton was Comptroller and Treasurer of the University of Georgia. The University of Georgia Athletic Association has as part of its duties the selling of tickets. The Athletic Association operates intercollegiate football. This embraces the sale of football tickets, hiring coaches, and the organization of the Athletic Association staff. The proceeds from the sale of the tickets ultimately should have been paid to the treasurer. Mr. Broadnax was business manager of the Athletic Association. We will give his evidence in more detail. He testified: "I was business manager of the University of Georgia Athletic Association. My duties were to handle all the business for the University Athletic Department, and to supervise the sale of tickets to football games. That was in 1947. I handled the sale of football tickets for the 1947 games all that year. My office was in Memorial Hall here in Athens. I had the right to hire and fire my help there. I had six employees in the office there. The number I had depended on the season; in the first part of the season working regular we had four. I have been the business manager there since 1937, except when I was in the service. . . I hired Roger Simmons to work in the ticket office in 1947. . . His duties in the office were to take the cards that had been checked by Mrs. Stewart and run them up and as he ran that up, mark the cards paid. In his capacity, he would be a clerk in my office. In his capacity he had custody and control and had access to all the money taken in in the sale of tickets. Yes, he had control of the money in his possession, and also control of the office. What he actually did was that as the ticket orders would come in, Mrs. Stewart would open the mail and check the cards, the application blanks, and see if they called for the right amount of money or money order, and then she

would turn them over to Roger to ring them up and he would ring up the tickets to each game; in other words, if the application had two or three games, he would ring them up and would mark the proper symbol to each one, and he would take the sales slip and compute the sales slip and amount of money that goes with that slip. Yes, he handled the money, money orders, and checks. He worked day and night. Roger started in the daytime and when the work got so heavy he would work at night. He worked by himself. Yes, he had control of any day's tape; he made those out and tried to break them at between twenty-five hundred and three thousand dollars for the sale slip as, whenever over that, it would be hard to check the tickets for each game. That is correct, the tape had symbols. The first notice of the shortage— of course, we checked each game, and after the Furman game, the first game, it was one hundred and thirty tickets off, and we didn't worry so much about that because in ringing up the tape he might hit the wrong symbol and the next game might be over and it would balance off. Yes, it would show up on the next game. North Carolina was the next game and the next game was short too, and we began to worry about it. The L.S.U. game was the first game that showed a large loss. I reported the matter to Mr. Bolton and we began to be very concerned about it. The Alabama game was a big game and there was a big shortage there and there was no overage to take care of the shortage from the L.S.U. game when we combined the audits, and we tried to run a trial balance on it, and we thought we might find the shortage there, but we found that the Alabama game was short also. Yes, after we figured the Alabama game we figured the Alabama game short also. When I found it was short I began to inquire about and inquired about students or anyone else who had too many tickets to sell, and I heard at that time about two or three places that had tickets. Yes, I was able to trace some, I had heard about two or three places of students having blocks of tickets, and I knew that no individual had that many tickets; so then I went to Mr. Bolton and Dr. Caldwell to see about hiring investigators to see where the leak might be. Yes, I hired investigators. I employed Huston and Garges. They came here after the Alabama game. They came on a Tuesday or a Wednesday, I think the first part of the week, and then began tracing

those in town and learned—coming down to the Tech game, something had been done, I don't know about an arrest made before the Tech game, but we knew about it. The first time I knew where the tickets were going was after they had been here a day the investigators heard about it the first day. No, I can not testify of my own knowledge anything that would indicate where the shortage was, or indicate to me which person was short. I couldn't really say; I couldn't say until that morning when Roger told the investigators and they had made their investigation. I did not go with them. The investigators came here and we gave them the name of Hudson,—that was John B. Hudson. I gave them his name because I found out Hudson had a block of tickets. What called my attention to that block of tickets was I knew no individual would have had twenty-eight or thirty tickets, and I think he had twenty-eight. Yes, the investigators found that they came from some other source. I got that information of a student having twenty-eight tickets, and I got that the first time, I think, from Charlie Martin running the Holman Hotel and that was by conversation. Yes, Tech tickets,—and then I went to F. Sudith. I subsequently found out where the block of tickets went. A boy named Cook had possession of those tickets, in Atlanta; he got them from Hudson and handed them to the investigators. That was a block of twenty-eight tickets; that is what Cook had. Yes, there were other tickets there, and while one of the investigators was talking to Hudson he brought in some more tickets. I think he did return some tickets. Mr. Bolton made a list of the tickets returned. Yes, I am familiar with the list of them. Yes, those were the tickets that were returned. The total number of tickets, twenty-four. They were in Roger Simmons' possession. Yes, we got some tickets from Edwin May. I don't have any record of the tickets returned by May. The tickets shown on there and the tickets from May were not paid for then, before then, to the Association. Those were not purchased from the Association through the regular channels. No money came to the corporation from the sale of those tickets; the tickets themselves were returned. We did not get the block of tickets that Cook had, because he sold them. I am going from memory; those tickets were located in the south stand, I think section E; the tenth or eleventh row, I think.

Definite information as to that would be in the investigators' knowledge. Yes, I am sure from my own knowledge, at the office I have a couple of those tickets signed and initialed. We never got those tickets back. I was present. I met Roger with the investigators at the train. We met Roger at the railroad station. He had been to Washington, D. C. Huston, Garges and I were present at the train. Yes, he was on the train coming from Washington, D. C., Roger Simmons. I met Roger and I told him we would like to talk to him a few minutes, that I had a couple of people I wanted him to see, and I introduced him to the two men. He talked to some boy and said that he would see him later. We went over to the hotel, the Holman. At the hotel Simmons was questioned in regard to the tickets. He made a statement to me about his part in it. Yes sir, he made a statement to me. It was freely and voluntarily made, without the slightest hope of benefit or the remotest fear of injury. I did not offer him anything nor threaten him in any way. No one in my presence did."

Cross-examination: "I met the train in the early morning, on a Sunday morning, that early train in the morning, and I had two investigators with me at the time. Those are the two men I referred to. I had a car and took Roger to the hotel room and they asked him questions; yes, those two men making the investigation. I told Roger who they were. No, it is not true that I or any one of those men told Roger he had better come clean. No, I did not say anything like that to him. I imagine he was there two hours. He did not attempt to leave before the conference was over, in the meantime he walked out and talked to May. That what he said was in answer to question[s] is not true altogether. They asked him two or three questions and then he told where he got the tickets from and he recognized May told it and that May told that he got those tickets off him, and then he said he went to Washington, D. C., and went to the building of the F.B.I. or some building there and that on his way back he wasn't able to eat or sleep on this trip and he very freely gave us all the information. To my knowledge there [were] no promises or some inducements if he would tell about this he would come out lighter and would not be prosecuted; I wasn't in there all the time. I wasn't there all the time. . . He put that state-

ment in writing. Yes, that is the statement he wrote there. . . In detailing the duties of Roger Simmons, I said one of these ladies checked the cards and Roger would ring them up; he would ring them up on the cash register. And his tape from that would go into the office of the auditor. I said those cards were the application blanks. By that I mean orders for tickets. They were accompanied with checks or cash or money orders, and then they were checked off as paid. Roger wouldn't ring them up marked paid and check against the amount of tickets and check the balance. And they all passed these ladies once before Roger rang them up; they passed through her hands, and he rang them up what were already checked. Mrs. Hill, Mrs. Hill's husband and myself would mail out those tickets to fill those orders, and we had a son of a woman who works in the office, Mrs. Averitt's son. They mailed the tickets out. No, Roger didn't. Where did they get the tickets from? The tickets were in the vault. The tickets were in the vault and Roger Simmons was in charge of the vault and he was in charge of ringing them up and he would make up the tickets; he would be in charge of the tickets mailed out. The tickets were in the custody of the Athletic Association in their vault, yes, sir. And then I would get them out. Roger never did get the tickets out to mail out. After we got them out and we mailed them out, they were not in his custody. They were in his custody before mailing out. I did not get them from Roger because Roger worked at night. Those were mailed in the daytime. No sir, Roger did not, he rang up the tape. He had access to the vault, he had to go in there to ring up the tickets. No tickets were rung up in the vault by these women. The lady checked these and handed them to Roger; she would open the tickets and put them in the files and the checks and money orders attached, and Roger checked them back as they were as the day's sales and he would ring them up. No sir, he never had the custody of those tickets. If he took those tickets out he didn't have anybody's authority to take them out. He did not have custody of them; I would say I would have custody of the whole picture. I was the one who employed these two investigators; they came from Atlanta. They were investigators; I don't think and I don't know whether they were detectives. They were an investigating company, a part-

nership, I imagine, in that business. I employed them for this purpose. It is not true I made a statement a while ago that I knew of this shortage one day before I employed the detectives. I didn't say that. Mr. Pollock asked me when these men made their report, and I said after the Alabama game, to the best of my knowledge. If I knew the date they played Alabama I could tell you how long after the Alabama game; I said I have forgotten. I can not say definitely whether I kept a record of the day I employed these men, may be the 10th or 12th of the month of November. And the Alabama game was played on October 25th. It wasn't till ten or twelve days after that before they made their report. The investigators made the report. They sent me a copy of it; the written report. Mr. Bolton has it. The North Carolina game was the second game we played. I can not say what was the number of tickets short at that game; it was one hundred and thirty-five or one hundred and twenty-five, I think that is the figure. And it was along in November before I employed these investigators; yes, that is right. We played Tech on November 29th. It was from the 12th to the 29th before that game when I employed these detectives. . . I am not in the employ of the University now. I left their employ April first of this year. There wasn't any reason why; I just wanted. Yes sir, I quit. . . And went in business for yourself? [Answer] Yes.

"At the time I met the train, it was early in the morning; before the sun was up, I think it was. I and the two detectives met the train and Roger Simmons was on that train. I met him and told him I wanted him to come with me. I introduced him to the two men. . . I told him while we were at the depot that they were two investigators and that they wanted to talk to him and I wanted them to talk to him. Before we went anywhere else I told him that. . . It is not true that one of the three of us made the statement to Roger Simmons 'you had better come clean with this thing' and that it would be lighter with him if he confessed it. If it happened it was not when I was in the room. No sir, that statement, that if he didn't make it he would be prosecuted was not made while I was in the room. If the others made it, it was while I was out of the room. No sir, I did not make that statement, and didn't hear anybody else

make it. One of the investigators told him that they had some tickets that May had and they got some money from May, and that is when Simmons made his statement. This written statement, and then, as I remember it, Roger said: 'May said he told you he got those tickets from me' and that is when Mr. Simmons made his statement. Yes sir, this written statement that Mr. Pollock showed me; I looked at that. That was written by Roger Simmons; he wrote that there in the room. He was finishing it when I got there; I wasn't in the room all the time when he was writing it. No, I don't know what occurred when he began to write this. No, I did not have anything to do with dictating that or telling him what to put in it. No, I don't know what occurred when I was not there. Yes, I got there when he finished writing this. No, we don't have the questions and answers between Roger Simmons and us in that room; the first statement was when Roger Simmons realized that May had been caught with the tickets, and the first statement he made was, he said, 'Oh, I am glad to get this off my mind.' That is the way he started. Yes, I stayed in the room and heard the first statement he made. . . The tickets that I got from Roger were gotten Monday after this conversation, after this was all over; he brought them in Monday and gave them to Mr. Bolton. No, while we were talking up in the room and the examination was being made, I wouldn't say it was one investigator doing most of the talking. I asked him questions. I think it was Huston who asked him most of the questions. Yes, the other one asked questions and he left to go with me. They brought May in a different room in the hotel. They did not bring May in that room; they went to May and talked to him in another room. . .

Redirect: "What would be the value of fifty-two Georgia Tech tickets? [Answer] The value of fifty-two, . . $218.40 is about right. Yes, at the time Roger worked at night. He worked at night and Abit McKay worked in the daytime and he [meaning Simmons] was the only one up there and had control then. Yes, he put money in the safe at night. The tickets were in the safe. Roger was the only one who was there; he was the only one supposed to be there; if anyone else was up there, he let them in. I said, as far as I know, he was the only one working in the office unless Roger went and got them and

let them in. I don't know who else was there, if any one, as I wasn't there. I did not give any one else permission to be there. I say that Mr. Simmons was in the employ of the Association. He was paid $75 a month from the time he started until school started."

In addition to the above evidence, we will call attention to certain excerpts from the statement of the defendant relative to the general grounds, as follows:   "On a week-end visit home, I told my parents of my decision to take the post in the ticket office.  My father was dubious about the advisability of accepting such a job, especially since it carried so much responsibility. He advised me not to take the job, but I laughed off his advice and told Broadnax I would work for him. . .  For the first few days I worked I was alone, but later had several helpers. . .  My job was to accept all mail orders for tickets, ring up on my cash register tape the number of tickets for each game and the price paid on same.  Cards, after they were rung up, were filed in order of date received, to be filled later and sent out in order of priority. . .  It was a custom of mine to ring up orders containing requests for season tickets all at one time, when available.  In this way I could accumulate a full tape in a hurry.  I might explain that by a full tape I mean have a minimum of $2,500 of sales on the register, so that this money, in checks and cash, might be hastened up to the Treasurer's office.  Broadnax informed me that the University needed $30,-000 to meet some sort of obligation.

"Accordingly, I worked sometimes at night to achieve the $30,000 goal by the time specified.  I believe it was set for some time in July.  Often, I set aside all checks, as they filled the cash drawer to overflowing.  I put them in a pasteboard box, later to be sent to the Treasurer's office with the finished tape, and a detailed report of the tickets by individual games, broken down by a student worker.  The cards of ticket orders, with numbers of tickets wanted and amount enclosed, were run up together and then marked 'paid' after which they were filled.  On one occasion I laid aside some checks and later could not locate them.  I was not sure if I had rung up the orders, and this worried me.  I confided in Massey, and he told me to forget it, that if money had been lost this would be known when final reports

were made. It was my feeling that the checks in question might have been accidentally thrown away with waste paper from the office in which I worked. This was not impossible by any means, checks and envelopes and stationery all mixed together. Several days later, in going through our card files, I located a number of cards which had not been marked 'paid' though there were no checks attached to them, and they were with the cards marked in that way. I presumed these had been paid for and that no mark made thereon was through an oversight. Later I wished that I had pulled those cards aside, for I thought that they might represent the checks I had presumably destroyed through carelessness. The idea preyed on my mind, I dismissed the thought. I was sent to Washington, D. C., as a representative of the National Journalism Association, and when I returned from my trip I found that instead of being head of ticket sales, I was just another worker. I made my own hours, however. For all the work I had done, and some of it was really well spent, I received only one check, and that in the amount of $150, with $17 taken out as withholding tax.

"I continued to work in the ticket office, but, as previously stated, my status was much lower, and even the attitude of Broadnax towards me had changed. I sensed that he had something on me, but I did not know what. . .

"When the tickets arrived for the Georgia-Tech game, May was the first to ask for them. I laughed him off, explaining it was impossible, that all the tickets had been sold or were for students' use only. He was persistent in his efforts, even having the nerve to telephone me in the ticket office while I was at work asking when he could get some. Finally, probably more in disgust and in eagerness to be rid of him, I laid out a block of forty tickets on the table in my office. I told him he might take them if he wanted them, but that I would not give them to him. They were put on a shelf and he personally took them away from the athletic offices for sale. Still, I refused May's offer to pay for the tickets, and reminded him that as far as I was concerned, he had stolen the tickets. At about this time, the School of Journalism chose two delegates to attend a national convention in Washington, D. C. I was the alternate selected. I went with the other fellow, but the Monday night I left Athens on the train,

May was at the station hounding me for more Tech tickets. He had phoned me several times a day, being persistent in his demands for those tickets. He even came to the station and hit me for the last ones I had. Imagine my feelings when, as I swung off the train at six o'clock Sunday morning, November 16th, in Athens, Johnnie Broadnax and two other men moved over towards me. I knew they were not there to welcome me home. Each of the two men took a bag from me and hustled me to their car. Broadnax went to his own auto and trailed us uptown. . ."

The defendant's statement consists of approximately thirteen pages and we have set out the excerpts above for the reason that such excerpts refer more or less directly to the defendant's version as to his duties and as to what he did. It is clear to our minds from the evidence of Mr. Broadnax quoted and the portions of the defendant's statement as set out above, first, that Mr. Broadnax as business manager of the Athletic Association Inc., had the over-all custody and possession of the tickets and money of the Athletic Association and had the ultimate responsibility of accounting for the tickets and the funds derived therefrom, to the Treasurer. And it is equally clear to our minds from the evidence of Broadnax and the defendant's statement in his own behalf at the trial, that from the necessity of the situation Broadnax, in the hiring of the defendant, delegated to the defendant a share of the responsibility and duties of Broadnax in handling the tickets and the funds derived therefrom. The defendant, although not an officer of the Athletic Association, was the servant and employee of the Athletic Association, and by virtue of this employment and during the course of it, as the evidence and his statement shows, had the custody and possession of the tickets and funds derived therefrom and converted a portion of the same, while in his possession by virtue of his employment and entrustment and before the tickets or proceeds finally reposed in the possession of the Athletic Association. It therefore follows that the evidence is amply sufficient to sustain the conviction of embezzlement under the general grounds. In reaching this conclusion we are not unmindful and have not overlooked the earnest contention of counsel for the defendant that under cross-examination Mr. Broadnax testified in effect: That the

defendant never had the custody of the tickets and if the defendant took the tickets out, he didn't have anybody's authority to take them out. "He didn't have custody of them. I would say I had custody of the whole picture." The short excerpt from the whole evidence of the witness Broadnax when torn apart from the whole evidence on the question under discussion might tend of itself alone to partially substantiate the contentions of the defendant that there was no entrustment to the defendant in the course of his duties as an essential element of embezzlement. But when we view the whole evidence of the witness Broadnax as we have set out above, and the portions of the defendant's statements which we have set out above, it can be readily seen that such a construction of the evidence as contended for by counsel for the defendant is not tenable. The assignment of error on the general grounds that the evidence is insufficient to sustain the verdict is without merit.

■ There are seven special grounds. Special grounds 1, 2, 3, and 4 may be considered together. Counsel for the defendant deal with them thus. So will we.

(a) Special ground 1 is an amplification of the general grounds. We have fully dealt with this ground in the preceding division of this opinion. Any further discussion would be futile.

(b) Special ground 2 complains of the failure of the court to charge that before the defendant could be found guilty of embezzlement the jury must have found that the property alleged to have been embezzled was at the time of its conversion in the legal custody or control or possession of the defendant. We have also discussed this assignment of error in connection with the assignment of error on the general grounds. No further discussion of this assignment would be beneficial.

(c) Special ground 3 assigns error upon an excerpt from the charge of the court as follows: "The State does not have to prove all of the items charged in the indictment, but must prove that the defendant embezzled some one or more of the articles alleged." This court in the case of *Hetrick* v. *State*, 27 *Ga. App.* 671 (4) (109 S. E. 528), said: "It is not incumbent upon the State to show the full amount charged in the indictment. Any part, either the full amount . . or any part, would be sufficient as far as the amount involved in the case."

(d)   In special ground 4 error is assigned on an excerpt from the charge of the court as follows:   "I charge you that if there is a fraudulent taking or carrying away of the property, a subsequent offer to pay back the amount or paying back the amount, will not affect the crime."   There are two assignments of error as to this excerpt from the charge:   (1)   That it virtually instructed the jury that all they need find in order to convict the defendant was that he had fraudulently taken or carried away property; and (2) that it was an expression of opinion on the part of the court that the mere fraudulent taking or carrying away property constituted the crime for which the defendant was indicted and convicted.   The court in its charge to the jury read the indictment to the jury and in connection therewith read and instructed them concerning the provisions of the Code, § 26-2803, the section on which the indictment was based.   In our opinion, in the absence of a written request to charge, this was sufficient. The second assignment of error, based on the last portion of the excerpt, to the effect that the court expressed an opinion that the mere fraudulent taking and carrying away of the property constituted the crime for which the movant was indicted, is without merit.   There was evidence to the effect that there had been made, on behalf of the defendant, restitution of $1700 of the funds which he was charged with embezzling.   And when we view this excerpt in the light of the whole charge, the attack thereon has no merit.   In *Robson* v. *State*, 83 *Ga.* 166 (7) (9 S. E. 610), the Supreme Court said:   "The offense of embezzlement by a public officer is not the less punishable because the sureties upon his official bond have responded to the State for his default, and he has reimbursed them for so doing, though he be not indicted until afterwards."   See also *Coleman* v. *State*, 43 *Ga. App.* 586 (1) (159 S. E. 605).   The excerpt herein specified was adjusted to the evidence and correct as an abstract principle of law.

■   Special ground 5 assigns error on an excerpt from the charge of the court as follows:   "The defendant has made a statement in this case, which he has a right to do under the law. In all criminal trials the defendant shall have the right to make to the court and jury just such statement as he sees fit in his own defense.   It is not under oath.   He is not subject to be cross-examined unless he consents to be."   A charge to the same effect

is discussed first, so far as we have been able to ascertain, in *Cargile* v. *State*, 137 *Ga.* 775 (2) (74 S. E. 621). It is there stated that a charge like the one contained in this ground is not ordinarily a ground for a new trial. This question was again discussed in the case of *Willingham* v. *State*, 169 *Ga.* 142 (7) (149 S. E. 887). By reference to these authorities it will be discerned that it would be better for trial courts to omit this phraseology of which complaint is here made, but we find no reason for reversing the instant case, under this record, because of such charge. We call attention also in this connection to a recent case of the Supreme Court, *Grimes* v. *State*, 204 *Ga.* 854 (51 S. E. 2d, 797). This ground shows no reason for reversal.

■ In special ground 6 the defendant contends that the court during the trial of the case continuously propounded to various witnesses questions, injected remarks, and had colloquies with attorneys, all of which had the effect of prejudicing the minds of the jury against the defendant. There are 16 specifications of these complaints. Counsel for the defendant contend that the continuance of the court in this respect throughout the trial and the prejudices thus occasioned to the defendant's cause would warrant this court in reversing this case. There were no objections made at any stage of the trial to this alleged improper conduct of the trial court. In the absence of such objections, this ground is without merit. In *Pulliam* v. *State*, 196 *Ga.* 783 (6, 7) (28 S. E. 2d, 139), the Supreme Court said: "Where on the trial the court propounded certain questions to a witness, which examination, it is insisted, was conducted in such manner as to prejudice the rights of plaintiff in error, such action on the part of the court will not cause a reversal, in the absence of any objection having been raised thereto at the time. The decision in *Potter* v. *State*, 117 *Ga.* 693 (45 S. E. 37), on the question of procedure here dealt with, is expressly overruled; and so as to any other case conflicting with the ruling here made." See also *Daniel* v. *Etheredge*, 198 *Ga.* 191 (15) (31 S. E. 2d, 181).

■ The assignment of error in special ground 7 is substantially the same as the assignment of error in special ground 6. The authorities cited as controlling in special ground 6 are controlling here, for it appears in this special ground that error is assigned on the court's words during a colloquy between counsel

and the court with reference to the questioning of a witness as to what was sought to be proved by him.

The court did not err in overruling the amended motion for a new trial for any of the reasons assigned.

*Judgment affirmed. MacIntyre, P. J., and Townsend, J., concur.*